

# NUMBER 13-16-00701-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

DAVID MALCOLM STRICKLAND,                                          Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

On appeal from the 36th District Court
of San Patricio County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Longoria**
**Memorandum Opinion by Justice Benavides**

By twenty-seven issues, appellant David Malcolm Strickland challenges his

conviction for capital murder, a first-degree felony.   *See* TEX. PENAL CODE ANN. § 19.03.

Strickland alleges:   (1) his conviction is void because the assistant district attorney's bar

license was suspended during his trial; (2, 3) the evidence was insufficient to support a

conviction for capital murder; (4, 5, 6) the State destroyed ballistics evidence, thereby

denying him due process of law, effective assistance of counsel, and the right to cross-examine witnesses against him; (7) the State was obligated to correct false testimony of its ballistic expert; (8, 22, 23) the State denied him due process when it failed to provide all of the chain of custody documents relating to a pubic hair found on one of the complainant's clothing; (9) the indictment failed to charge capital murder in paragraph one; (10, 11) the trial court deprived him of his right to present a complete defense regarding an alternate suspect; (12) the trial court abused its discretion by refusing to admit videos on hearsay grounds; (13, 14) the trial court denied him compulsory process by issuing a faulty long-arm subpoena; (15, 16) the search warrant for his home was an illegal general warrant; (17) his motions to suppress the search warrants were incorrectly denied; (18) the trial court's response to a jury note was misleading about the ballistics testimony; (19) he was unfairly prejudiced by the actions of the complainant during trial and her negative remarks to the jurors; (20, 21) the trial court abused its discretion by failing to suppress evidence obtained during the warrantless seizure of his gun; (24, 25) he was denied due process when the State failed to execute the trial court's order to test the hair from the complainant's clothing; (26) the trial court abused its discretion in denying his motion for new trial; and (27) this Court erred by denying the motion to abate the appeal for consideration of newly discovered evidence after trial.   We affirm.

## I.   BACKGROUND

The State alleged in its indictment that on June 22, 2012, Strickland: (1) intentionally caused the death of Mollie Olgin in the course of sexually assaulting Mary

2

Kristene Chapa[1]; (2) intentionally caused the death of Olgin in the course of robbing Chapa[2]; or (3) intentionally caused the death of Olgin in the course of kidnapping Chapa. *See id.* § 19.03(a)(2).

## A.   Pre-Trial Hearings

Prior to trial, the trial court held multiple hearings regarding a motion to suppress the gun seized from Strickland and a motion to suppress his statement.

### 1.   Gun

Strickland first challenged the warrantless seizure of his Glock .45 firearm and the admissibility of ballistics evidence.   At a hearing in July 2015, Officer Joaquin Rangel of the Portland Police Department testified that a concerned citizen called into the police department and said there was a man with a firearm at a local store on July 19, 2012. The caller stated that they saw a gun when the man was loading soil into his vehicle, but gave no description of the man, just the type of vehicle and the license plate number. The license plate was registered to a home owned by Strickland.   Officer Rangel went to the home, and Strickland was outside, shirtless, with his dog.   After being asked to take his dog inside, Strickland complied and returned wearing a shirt and carrying a firearm on his person, stating it was his right to carry the firearm.   Officer Rangel stated he disarmed Strickland and took the firearm into his custody.   He agreed that Strickland had shown him his concealed carry license, but Officer Rangel stated it could be an offense, such as unlawful carrying of a weapon, if someone saw the firearm.   Officer Rangel testified that

---

[1]   Issues with the State's indictment and the lack of an aggravating factor in Count One are addressed in Issue Nine of this opinion.

[2]   The State waived and abandoned paragraph two of the indictment during trial.

he could not remember if he had Strickland's consent to take the firearm and all he had was a property receipt given to Strickland.

Officer Roland Chavez, also with the Portland Police Department, testified that he had heard about the incident at the local business and directed Officer Rangel to impound the firearm. The following day, Strickland came to the police department and wanted his gun back, stating he was going out of town. Officer Chavez stated that Strickland had signed a consent to search form for the firearm, and Officer Chavez took the firearm and test-fired it at the local sheriff's office gun range, due to the ongoing murder investigation. After he test-fired Strickland's firearm, he returned it to Strickland. On cross-examination, Officer Chavez stated there was no written request to test-fire the firearm. He stated that he had six .45 caliber bullets at the range; that he fired four of the bullets and retrieved two of the casings he felt were in good condition. He explained he test-fired the bullets into a dirt mound, and only recovered the casings, but not the projectiles.

The trial court denied Strickland's motion on September 22, 2015.

2.    **Statement**

Strickland also challenged his statement given to Texas Ranger Randy Aguirre on June 20, 2014. Ranger Aguirre testified that he met with Strickland at the Helotes Police Department and gave him his *Miranda* warnings, which Strickland stated he understood, but refused to sign, stating he "wanted to keep his rights in effect." However, Strickland also said he would continue speaking with Ranger Aguirre, but if any of the conversation involved "Chris,"[3] he would like to get a lawyer. Defense counsel stated to the trial court

---

[3] Strickland was referring to Christobal Melchor, an ex-friend of Strickland, who filed several criminal charges against him in Utah.

4

that the motion only involved the first six minutes of the nearly three-hour statement.

The trial court made detailed findings of fact and conclusions of law in its order issued on September 22, 2015. It suppressed any statements made regarding Chris Melchor and the charges pending in Utah against Strickland. The trial court overruled any other objections made to the admission of the statement.

## B.    Trial on the Merits

### 1.    State's Case-in-Chief

### a.    Lay Witnesses and Initial Responding Police Officers

Trial commenced on September 19, 2016. The State called multiple lay witnesses who first discovered Olgin and Chapa. Christine and Stanley Seymour were walking at Violet Andrews Park on the morning of June 23, 2012, when they saw two bodies below the bird-watching overlook on which they were standing. Christine stated that she saw two females, partially clothed, with one girl partially on top of the other. She also saw blood marks. Christine ran to the home of Ina Brown, who called 911. Brown testified that she accompanied Christine back to the overlook, and while they were waiting for police to arrive, they saw one of the girls move. Brown stated she called 911 back and told them to bring EMS. Brown also explained that the night prior, she thought she heard shots around 11:30 PM or 12:00 AM. At first she thought it was fireworks, but felt one was distinct and one was more muffled.

The State called Daryl Genzer, who also lives near the park. He stated that around 11:30 PM, he heard pops that sounded muffled and a car door slam, but thought it was fireworks or animals. Further, Sheryl Manning and Reynaldo Zepeda testified that

5

they were driving to Manning's home near Violet Andrews Park around 12:00 AM and noticed a dark car parked in the area between the parks where there are no lights. Zepeda stated the car appeared to be a dark sedan type vehicle.

Karine Woods testified that she was at Violet Andrews Park late on June 22, 2012. Woods explained that she and a friend were on the rooftop of the picnic pavilion watching the stars when she heard what she thought was two gunshots. Woods thought it was kids shooting at the water, so she yelled out not to do that. A few minutes later, Woods saw a male run from the overlook to a parked car at the end of the road, thought she heard two car doors slam, and then noticed the car drove off quickly. She described the male figure as "tallish" and "broad."

Officers Cody Renfro and Travis Wiesman of the Portland Police Department were the first officers to the crime scene around 8:50 AM on the morning of June 23, 2012. Officer Wiesman ran to the girls to check for pulses. He testified that Olgin was cold, but Chapa sat up and moaned. Officer Renfro stated that Chapa had black duct tape around her neck. The State admitted a video taken of the crime scene during its testimony. The scene was secured once Chapa was taken out by EMS services. Diana Gafford, an EMT from Allegiance Ambulance, helped take Chapa out of the crime scene. Gafford explained that it was apparent that Chapa had a head injury and it appeared she also had a broken jaw, but Chapa was looking at her and Gafford felt that Chapa understood what she was saying to her.

Cara Schrader, a crime scene investigator with the Corpus Christi Police Department, was asked to assist the Portland Police Department with evidence collection.

She explained that because they were working in a park, there were a lot of items lying around, so she focused her collection on items that appeared to not be weathered. On the trail leading down from the overlook, Schrader found cigarette butts, cans, and bottles that she collected. When she got closer to Olgin's body, she explained that Olgin's face was wrapped with black duct tape and they were unable to identify her. Schrader found a spent .45 caliber casing near Olgin's head and one under her body, as well as a metal bullet jacket.

Schrader explained that Corpus Christi Police Department crime scene investigators are available to assist other police departments and they have a lab that can swab for DNA, test firearms, and develop latent fingerprints. She said the firearms section of the crime lab can test-fire weapons and recover the projectiles and casings for review. Schrader took the evidence she collected back to her station and secured it, but at one point, she was instructed to take all of the evidence to the Portland Police Department. She agreed that it was the investigating police department's job to get evidence tested; she was just involved to help collect evidence. She also stated that the cigarettes she collected were Camel Crush Bold cigarettes, and one of the cigarettes collected from the overlook had fresh ash on it. She also collected an open condom wrapper from an area by the overlook.

Mandy Festervand and Sapphire Martinez were friends of Olgin. Festervand testified that Olgin and Chapa came to visit Olgin's former co-workers at the Portland Taco Bell. Festervand said the girls had come by two different times that evening, once around 8:30 PM and later around 10:00 PM. She said the following morning, her boss

called her stating that Olgin's car had been found at Violet Andrews Park and she later found out that Olgin had been killed. Martinez agreed that the girls had come to visit at Taco Bell twice that night. Martinez had texted Olgin to come back the second time so they could visit more. She found out that Olgin was dead the following evening. Martinez recalled seeing an "odd" man at the memorial held for Olgin a few days later at Violet Andrews Park. She noticed he was walking around looking at the ground and thought it was strange.

Stephanie Chasak was Olgin's friend and former roommate. She explained she found out about Olgin's death the following morning through a phone call. She went with a group to the park and she noticed a guy walking behind them. She testified that she felt he matched some of the sketches that the police had released on the internet. The man spoke to her and asked what had happened, what the police knew, how she knew the girls, and then stated that he used to be in the military, owned a lot of guns, and that his girlfriend worked at Chili's and knew Olgin. Chasak said it seemed strange that he would come over and tell her all of this. She remembered that the man asked her if she knew what type of gun was used and stated that it could not be a certain type of gun because it would not make sense. Chasak identified Strickland in court as the "creepy" guy she spoke to. She agreed her identification of Strickland was not in her written statement she gave to police but she identified him by phone to the Portland Police Department.

b.  **Investigating Officers**

Officer Chavez explained he was the first investigator that responded to the crime

8

scene. He sent another investigator to the hospital with Chapa, and then tried to identify Olgin. He contacted Olgin's father who was able to identify her. He received information that Chapa was unable to speak, but later when Chapa could communicate, she did so in writing and gave a description of her attacker. Officer Chavez explained that they were only able to ask Chapa short questions due to her traumatic head injury. Chapa told the officers that her attacker was taller and thinner than her. There were no leads in the case until DNA results came back on cigarettes and a Monster energy drink can recovered at the scene, which matched a man named Dylan Spellman. A week after the offense, Alisha Dickey, Spellman's ex-girlfriend, came to the police station and gave a statement that she had been in Violet Andrews Park that night with Spellman. Police also took a statement from Spellman in which he stated he smoked Camel Crush Bold cigarettes. Portland police realized Spellman had committed a similar crime in Nevada, an armed robbery, and Spellman became the lead suspect.[4]

When police compared the Nevada case file to what was known about the murder, they observed that the Nevada suspects referred to themselves by numbers and bound their victims with duct tape; Chapa had told them her attacker called her and Olgin "Girl One and Girl Two." Officer Chavez also released the sketch made from Chapa's description to the public.[5] Although Spellman's DNA was on the overlook, Officer Chavez stated that Spellman did not fit the physical description Chapa gave them.

---

[4] Spellman was living in Portland, Texas awaiting sentencing on the robbery charge out of Nevada.

[5] As Chapa recovered, she was able to sit with a sketch artist who rendered two sketches, which police released publicly.

Spellman was close to six feet, eight inches tall, but Chapa said her attacker was only a few inches taller than her and she was five foot, seven inches tall. But Officer Chavez said they could not eliminate Spellman as a suspect because of the DNA evidence and Chapa's traumatic head injury and memory.

On June 27, 2012, Strickland came to the police station to give a statement, telling officers that he had seen a white car speeding by his parents' house around the time of the shooting.[6] About a month later, Strickland's firearm was confiscated by the Portland Police Department after the store incident and Strickland gave Officer Chavez consent to test-fire the weapon. Officer Chavez explained that while he would normally have submitted the firearm to the Texas Department of Public Safety (DPS) crime lab to test-fire and analyze, he decided to test-fire it himself because Strickland requested the firearm be returned to him so he could go out of town.

On cross-examination, Officer Chavez agreed that Strickland's DNA was not found on any item he submitted to DPS, but Spellman's DNA was present on multiple items. He explained that Spellman did not appear to have a criminal record when he ran his name, but he did an internet search and found the robbery charge in Nevada. Officer Chavez learned that the robbery in Nevada involved people being tied up with black duct tape and that Spellman was in Texas awaiting sentencing due to his cooperation against co-defendants. Spellman was living with some family friends, the Voorheeses, and working at their plumbing company. Defense counsel played a video showing police officers stopping Spellman the night following the murders and asking about a shots fired

---

[6] Strickland, Strickland's parents, and Spellman all resided within a few blocks of Violet Andrews Park when the offense occurred.

10

call they received at Sunset Lake, which is near Violet Andrews Park. Spellman spoke to the officers and mentioned hearing about the murder without the incident being previously referenced.

Defense counsel also went through some of the notes exchanged between Chapa and the investigators. She told them that her attacker was a white male, driving a grey "police looking car," had brown hair that was short and "puffy," had white teeth, and wore a mask. Chapa also said that she had noticed the grey "police looking car" parked next to them in the parking lot and she saw a man walk by them twice previously. When the man approached the girls, Chapa said he was holding a silver gun in his right hand. The attacker approached on Olgin's side and told the girls to jump off of the overlook balcony, as he put the gun to their backs. Chapa also recalled that he smelled like he smoked cigarettes.

Defense counsel attempted to admit evidence of an interview of Spellman taken by Officer Chavez, Ranger Aguirre, and others while he was in custody in Nevada. The State objected stating the interview was hearsay and the defense argued that Spellman was an unavailable witness whom they attempted to subpoena. Defense counsel explained he had followed the out-of-state subpoena procedure, but that the Nevada judge had rejected their subpoena due to a spelling error in the Texas trial court judge's name. When the trial court signed the subpoena, he corrected the error and that caused the Nevada judge to deny enforcing the subpoena. Defense counsel argued it was too close to trial for them to have the trial court issue another subpoena. The trial court sustained the objection.

11

Officer Chavez admitted on cross-examination that in hindsight, he should have used the Corpus Christi Police Department's firearms range to test-fire Strickland's gun because he could collect the bullet casings and projectiles. When questioned about why in pre-trial hearings he testified to shooting four bullets but only collecting two casings, Officer Chavez agreed that he did not know where the other two casings were. He also stated that there were no witnesses or video of him conducting the test-fire of Strickland's weapon. Officer Chavez also found out about two subsequent incidents shortly following the murder where there were reports of shots fired near Violet Andrews Park and Spellman was in the area. He stated he only learned of the reports months after they occurred, but they caused him to take a closer look at Spellman.

Officer Chavez was questioned about the Nevada interview of Spellman. After the officers arrived in Nevada, they read Spellman his *Miranda* rights, and he spoke with them for awhile, but he then invoked his rights and the interview ceased. Defense counsel attempted to admit the interview a second time but the trial court sustained the State's hearsay objection that Spellman was not an "unavailable" witness.

At a memorial service held at Violet Andrews Park for Olgin, Officer Chavez and other law enforcement officers videotaped near the park to see if anyone matching the descriptions Chapa had given attended. Officer Chavez did not remember seeing Strickland on the videotapes. He also stated that as the police investigated Spellman and looked into his job in Portland, Officer Chavez believed the police officers found black duct tape. Additionally, Officer Chavez testified that Chapa's phone had been found around the corner from the local Snappy Stop convenience store, where Dickey worked

at the time and near where Spellman lived. Officers had requested Spellman's debit card history and it showed that Spellman used his debit card at a Snappy store around 1:15 AM on June 23, 2012. They first assumed it was at the same Snappy store near Spellman's home, but further investigation showed that it was a different location across town. However, Spellman had told officers that he was home and in bed before midnight on June 22, 2012. Even with the information gathered, as time passed without an arrest, Officer Chavez considered this case a "cold case" during the time of his involvement.[7]

Officer Rangel testified regarding the incident that led to him confiscating Strickland's gun. He stated that Officer Chavez told him to confiscate the weapon for a possible violation. Officer Rangel took the firearm from Strickland and placed it into evidence at the police department. On cross-examination, Officer Rangel explained that he resigned from the police department due to an internal investigation.

Gary Giles, the former chief of police in Portland, testified that in May 2014, he wanted to get "fresh eyes" on the case because it was not going anywhere in terms of finding a suspect. He felt that Officer Chavez's work on the case was unorganized and transferred the case to Lieutenant Jon Quade. Chief Giles also worked on the case himself, along with Ranger Aguirre and Investigator Aaron Veuleman from the Portland Police Department. Chief Giles felt that if the case had been better organized, things would have been discovered earlier and he criticized the procedures Officer Chavez used in test-firing Strickland's weapon. He also agreed that collecting all pieces of the bullet evidence would be most useful, and that the shell casings would have been important

---

[7] Although Spellman was investigated, Portland police never issued a warrant for his arrest.

evidence.

He admitted that a letter received by the police department in 2014 was what changed the direction of the case. Chief Giles stated that the letter made him think they were looking in the wrong direction in terms of suspects, and they followed up on the name Chris Melchor that was listed in the letter. When they received reports regarding Melchor from the Layton, Utah police department, Strickland's name appeared on the reports. He felt the letter was intended to be a distraction.

Investigator Veuleman testified that he was new to investigations in 2012, so initially his involvement in this case was just taking statements, but he became more involved in the spring of 2014. He stated that he received a call from the Sinton Police Department reporting that a letter was received that contained details about the crime that were not released to the public or media. The letter was addressed "For the eyes of Mr. Chapa only, Important details inside."

### c.       The Letter

Mr. Chapa,

My name is of no importance, but suffice to say I have detailed information regarding what happened to your daughter. There is a man who has recently sought my services in problem solving, while it is typically a job requirement for a person like myself to never question a job or even possess a trace of a conscience. I am a different sort, by no means a good man, but I prefer to screen my clients and their requests. Upon inquiring these are the details given to me, please excuse me for being blunt and to the point but you are going to want to hear what he told me.

"There is this chick living in Sinton Texas, I need her to disappear. (he mentions two others not relevant)"

"Why do you need that?"

"I heard you wouldn't care as long as you got paid. Maybe you aren't the guy for this after all."

"I just don't like going in blind, answer a few questions and I will look into it."

"Fine, what do you want to know?"

"Who is she?"

"The name is Mary Chapa, she is a problem. I need to move back to the area soon and if she sees me, I am dead."

"Why does she want you dead?" (getting to the point now, skipping ahead)

"I was having a bad night, trying to hunt down my wife. She left with my kids in the middle of the night. I chased her down to Texas. I was in Corpus Christi, I had some coke, and then stopped to get some Taco Bell. This bitch working there was just giving me attitude, she fucked up my order and she was just asking to get fucked up."

"I don't really think killing a girl for messing up your taco is good business. I prefer child molesters or violent felons not taking no for an answer."

"Then you really are not the guy for this. I'm leaving."

"I still haven't said no, and can you really find another person in time? Tell me what happened that needs this kind of solution."

"Fine, but if you cross me, I want you to know what you have coming to you. I followed her, she went to a park with her girlfriend. I pulled up next to them, pulled out my gun, made them walk down a hill. I stacked them on top of one another. Fucking lesbians, they are less than people and I wanted them to know that. Ha ha, they were just numbers to me, so I called them number one and number two. I like Spanish women, so I fucked the Mexican bitch on top of the white bitch. One of them complained about the weeds being uncomfortable so I told her they were a lot more comfortable than a bullet in her head. Stupid bitch, a gun in her face and worrying about grass. When I was done I made them put duct tape around their mouths so they couldn't scream. Duct tape is better than any pair of handcuffs in my experience. I almost walked away, but then I thought about what a bitch she was, so I shot her girlfriend in the back of the head. I put the gun right next to her head so she could see what happens when you piss me off. Then I put one in her head as well. I want you to know, this is what I will do to you and the people you love if you cross me."

"I understand, you are a real tough badass. Got it. So how do you feel about what happened?"

"What the fuck do you care? Who gives a fuck, two lesbians die, sounds like the righteous fury of god is all I say."

We talked a while longer about the other two jobs, this would have been fifteen thousand in my bank account, but some things are worth more than money. I researched your daughter. This is not a job that meets my requirements. I however do not work for free, and I will not be handling him. I will however give you the information for you to take care of matters yourself. You could give this information to the police, but we know

how that will turn out. In return for me giving this information, I only ask that you not try to find me, nor give this letter to anyone. Destroy it when you are done. I do not work alone, and an agreement like this should be binding. Knowledge of me would end badly for myself and many others. In return for silence, I give you the man that I had this meeting with. His name is Christobal Melchor, also known as Sergeant Chris Melchor, and Sergeant Mel. He lives in Layton, Utah at the corner of 2150 N and 50 W. Works for the Army, he is pretty well connected, and from what I have seen, he is almost untouchable. Runs a minor drug operation, and the police turn a blind eye. Soon he will be returning to this area to be close to his children, but your daughter has seen his face, and he is reaching out to make this problem go away. If you decide to give this man over to the police, I ask that you do so in this manner. Tell them that your daughter was websurfing on facebook and came across his profile. He has made me believe that he did this to your daughter, but nothing is ever for certain. Let your daughter decide if this is the man. If it is not, then I am sorry, I tried to help. I will not be coming after your daughter, but this man was offering a lot of money for her life, she is not safe. His wife lives in Refugio, so he will have to be close to her. After this message is delivered, the recording of my conversation will be burned, and I will disappear from the situation. The next move is yours, but I urge you to respect my request on keeping me out of this. Betraying a client carries certain consequences, I would hate to think I am killed for trying to do a good deed now and again. I expect to die for this, but perhaps it is time.

Investigator Veuleman stated that the letter caused him to look into Melchor and contact the Layton Police Department, who sent him four reports involving Melchor. Strickland's name was listed as an involved party in all four reports and Investigator Veuleman remembered taking a report from Strickland in 2012 following the murder. Investigator Veuleman explained that details, such as the girls being numbered, were not released publicly, but were contained in the letter. He traveled to Utah to interview Melchor and his mother and looked into Melchor's whereabouts on June 22, 2012. While in Utah, Investigator Veuleman recovered evidence collected from an unrelated arrest of Strickland, which was a black backpack located in Strickland's vehicle. He explained that the backpack could be referred to as a "go bag" and contained: bolt cutters, flex

16

cuffs, a baton, gun holsters, a safety vest, lock pick, Firestarter, headlamp, medical kit, hand sanitizer, mace, a knife, fire kit, seatbelt cutter, and a condom and lubricant. In addition to the backpack, Investigator Veuleman also recovered a pair of black Under Armour brand gloves which he felt were important because black Under Armour gloves were mentioned in the case report and a black CTR mask. Upon returning from Utah, a photo lineup that contained Strickland's photo was created and shown to Chapa. Chapa selected a photo that was not Strickland and stated that she was fifty percent sure it was that person. Investigator Veuleman also drafted an arrest warrant for Strickland upon his return from Utah.

On cross-examination, Investigator Veuleman agreed that he drafted and requested a no-knock search warrant for officer safety, even though Strickland was arrested prior to its execution, stating that he had drafted the warrants before traveling to Helotes, Texas, where Strickland now resided. Defense counsel asked him about details of the investigation that were not released to the public due to confidentiality policies of the police department. He agreed that his wife worked with Strickland's wife, and he discussed details of the case with her, although he claimed it was after Strickland was arrested. Investigator Veuleman also admitted to emailing with Chivas Savage, a co-author on a book Chapa was writing about surviving the attack. He agreed that he gave information to Savage in violation of the Portland Police Department's policy, and that they discussed which actor would play him in a movie and conversations that he had with the prosecutors about the case. The email discussions were discovered after defense counsel requested subpoenas for emails; Investigator Veuleman admitted that his

17

superiors would not have known he was talking to the author otherwise, and that he was terminated after it came to light that he had violated the police department privacy policy. Investigator Veuleman also testified that he received a roll of silver duct tape from the Layton, Utah Police Department, but there was never any information that the attacker used silver duct tape.  He also stated that Strickland worked as a security guard in Utah and that some of the items found in Strickland's backpack–such as the baton, handcuffs, mace, and the headlamp–were not unusual for people in that profession to carry. Investigator Veuleman agreed that the CTR mask and gloves could be worn during cold weather, like they had in Utah.  He also admitted that the letter, while it had some of the facts correct, also had some incorrect facts, such as how the girls were approached and that the sexual assault of Chapa occurred before the duct tape was applied.   Investigator Veuleman believed Strickland wrote the letter to implicate Melchor.

Ranger Aguirre testified that he offered his assistance after he heard about the murder.  Initially, he took aerial photos of the scene and statements from witnesses. Spellman came up as a suspect and Ranger Aguirre began looking into him.   Spellman gave a DNA sample, and evidence collected near the crime scene matched Spellman's DNA.   Ranger Aguirre established a timeline for Spellman after speaking to Dickey, and determined that Spellman was in Violet Andrews Park for at least an hour around midnight on June 22, 2012.   Ranger Aguirre was present at the interview Spellman gave in Nevada, but he also continued looking for persons of interest.

Chapa helped with two sketches of her attacker.  She gave details for the first sketch in early July 2012, but after she went to a neurological rehabilitation center in

18

Austin, Ranger Aguirre stated that she started remembering more details and did a second sketch a few weeks later. Ranger Aguirre also took a statement from Strickland following his arrest in Helotes. The nearly three-hour statement was played for the jury.

### d. Strickland's Statement

In the statement, Strickland stated he "wants to keep his rights intact" and if the questions involve Melchor, he would like to get a lawyer, but otherwise, he would answer the questions he felt comfortable answering without a lawyer. Strickland gave the officers a brief background of how he knew Melchor. He stated he personally has a concealed handgun license (CHL), carried a pistol with him, and knew guns from his time in the Army. He explained that Melchor got him interested in guns and convinced him to create the "go-bag" Strickland carried everywhere with him. Strickland said he has the "go-bag" in "case he ever needs it." Strickland bragged that he was a "good shot" and was a competitive shooter. He explained that after the murder, he went "all PI" (private investigator) looking into the details because he "liked to help people." Strickland had made a statement to police in 2012 telling them he saw a white car speeding down the road near his parents' house around the time the murder was believed to occur. However, after talking to his local insurance agent, Strickland said he realized the white car he told police about seeing on the night of the murder was the agent's and the timeline he personally developed was wrong because the white car was not related to the murder.

Strickland told the officers that he was at Chili's on June 22, 2012, where he waited for his wife to get off of her shift. He said Chili's closed at 11:00 PM, so they ended up leaving around 12:00 AM. Strickland's wife wanted to go walk their dog near Violet

Andrews Park, but they decided just to stay home instead.

Ranger Aguirre talked about the letter Portland police received and told Strickland they believed he dropped it off. Strickland asked why they thought surveillance video showed his car, but then stayed quiet and after a while stated the area where the letter was dropped off was on his way home from work. He then said he did not know anything about the contents of the letter. The officers told Strickland they would search his parents' businesses unless he told them where the computer was that he typed the letter on. Strickland said he did not know where the computer was that the letter was typed on.

Strickland stated he has "no idea what is going on" and the officers explained that they had matches on the .45 firearm with an aftermarket barrel. Strickland told them he knew they are lying about the ballistics. Strickland went on to say that he should have walked his dog that night like his wife wanted to because he could have stopped the attack, but they did not go. When the officers told Strickland they think his wife dropped off the letter for him, he said "this has been a long time game" and he "just wants to die." Strickland said "I'll tell you whatever you want me to say" as long as he received the death penalty in five days. He also repeatedly requested to speak to the district attorney (DA). He again stated that if he is given a "binding contract for the death chamber in five days," he would say whatever they wanted.

Strickland told the officers that he had never seen the girls until he heard about the murder the following morning and that the officers should ask Chapa what happened and show her the photos to determine who the attacker was. Strickland continued by saying

20

"if I did do this, I don't remember" and asked to "just make the deal with me for my execution" because "no one will be safe with me as long as I'm alive."

He told the officers later that he got off of work, went to Chili's, saw his friend Stephen there, and stayed until closing. He waited for his wife to get off of work and went home with her. Strickland said he went shooting the next morning. Strickland told the officers about his sister being kidnapped and raped when he was a child and his ex-girlfriend committing suicide. He again stated he wanted to speak to the DA.

Strickland then stated that he went to Chili's, where some girls said "shitty things" to his wife and did not tip her, so he followed them outside and called them "bitches." He overheard the girls say they were going to the park, so he followed and shot them, raped Chapa to "make her pay" for what she said to his wife, and he wanted to send a message to not "fuck with us." He then immediately stated he would like the death penalty now and his wife knew the truth, knew he did not do this, but it was what the officers wanted to hear. Strickland said he wrote the letter in the past two weeks and he used a computer in the Helotes library. At the end of the statement, Strickland stated he was exhausted, he told them what they wanted to hear, and he wanted to die to stop "holding" his wife back.

e. **Forensic Testimony**

Forensic scientist Nathan Calderon from the digital and multimedia evidence section of DPS testified regarding the laptop computer and tablet seized from Strickland's home in Helotes. He performed a data recovery and extraction examination on the laptop computer. Calderon stated that the Portland Police Department had provided him

21

with a letter they received, and he was able to find similarities to the letter when he ran a certain program that shows phrases that spell check sent to Microsoft.  Certain phrases found in the letter written to Mr. Chapa were located in the program.  Calderon said he had never been able to utilize this program in this manner before this case.  He also found that the laptop contained over fifty searches for "Chris Melchor," as well as a search for "2011 Portland park murder."[8]

Richard Hitchcock, the forensic firearm and toolmark examiner, testified next. Outside the presence of the jury, defense counsel took him on voir dire, and Hitchcock stated that while there was no universal quantifiable standard of agreement when comparing ballistics evidence, his opinion was based on his training and experience as a firearms examiner.  He also explained that he does not know the facts of the case before testing, but he analyzed everything that is submitted.  He also stated that he would not use a "level of certainty" when discussing the evidence, but instead would give his "expert opinion" as to what the evidence showed.

On direct examination, Hitchcock testified that he received certain pieces of evidence in June 2012:  State's exhibit 19, two bullet jacket fragments recovered from near Olgin; State's exhibit 17, a cartridge casing from under Olgin's head; and State's exhibit 18, a .45 casing from the ground behind Olgin.  He stated he could determine that all of the items sent were fired from a .45 caliber firearm with six lands and grooves inclined to the left.  He also explained that he can compare firing pin impressions, breech face marks, ejector marks, extractor marks, and chamber marks to help identify if bullets

---

[8]   Defense counsel pointed out on cross-examination that the murder occurred in 2012, something that "the true murderer would have known."

were fired out of certain firearms. He believed in this case that the bullet jacket fragments were fired from the same firearm. Hitchcock also informed the jury that Glock brand firearms have distinct characteristics, such as an elliptical instead of a round firing pin, and the lands and grooves are cut differently, leaving different depth of marks. He later issued a supplemental report where he analyzed some additional cartridge cases and a .45 Auto-Ordnance firearm found at Dickey's home. Hitchcock stated that the results from the .45 Auto-Ordnance were inconclusive. He concluded that State's exhibits 17 and 18 and two casings fired by Officer Chavez (State's exhibit 24) were all fired from the same gun, which was not the Auto-Ordnance, and had marks consistent with a Glock firearm.

In July 2014, Hitchcock was sent Strickland's Glock firearm to test, two barrels: a Glock factory barrel and a Storm Lake barrel, as well as a Shooters Depo Model A Lion sound suppressor. He stated that State's exhibit 19, the bullet fragments, were not fired from the Glock pistol with the Glock factory barrel submitted to him. State's exhibit 19 was "neither identified nor eliminated" as having been fired from the Glock firearm with the aftermarket Storm Lake barrel. He stated although the two submitted barrels did not match the marks on the submitted casings, he was able to identify, in his expert opinion, the four cartridge cases as being fired from Strickland's Glock firearm (State's 17, 18, and 24).[9]

On cross-examination, Hitchcock testified that the Portland Police Department later submitted an additional firing pin to him, which he placed in Strickland's Glock .45

---

[9] Hitchcock stated that he made "corroboration in the breech face marks, the firing pin impressions themselves down to the firing pin, the firing pin drag marks," and the firing pin aperture shearing marks.

firearm and test-fired. He agreed that he did not get to test-fire Strickland's Glock firearm until July 2014. He also testified that the sound suppressor paperwork was not submitted to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) until September 2012, which is required before the purchase is allowed, and after the date of the murder. Hitchcock also agreed that State's 19, the bullet fragment, was not fired from the Glock pistol with the factory Glock barrel installed on it. When asked about the Storm Lake barrel, Hitchcock stated that it was inconclusive if State's 19 was fired from it, because it contained striae not present on State's 24. He also explained that he takes photos to document his work for a reviewer, but they are not evidentiary and not retained. Hitchcock felt the photos would be misleading to the jury. He stated that the photos were not deleted to prevent a defense expert from reviewing his work, because the evidence is available for another expert to review and form their own conclusions.

Dr. Ray Fernandez, the medical examiner for Nueces County, testified regarding Olgin's injuries. He stated that during the autopsy, he noticed a gunshot wound at mid-back of her neck. The gunshot went through her spinal cord and broke her jaw from back to front. He classified the manner of death as a homicide.

### f.    Complainant and Additional Lay Witnesses

Chapa was the State's next witness. She told the jury that she had known Olgin about six months and they were dating. On June 22, 2012, they were supposed to have gone to a movie but missed it, so they drove around instead. Olgin wanted to go see her friends at Taco Bell, so they went there, and then drove to Violet Andrews Park. While they were there, they got into a fight because Chapa did not want to get out of the car

24

because she said it was dark and scary. Martinez texted Olgin to come back and visit, so they left the park and went back to Taco Bell. Upon leaving Taco Bell, they went back to Violet Andrews Park, because Olgin wanted to show Chapa the overlook where she was baptized. As they turned to walk back to the car, the attacker approached Olgin's side with a gun. Chapa said they were just stepping off the overlook at this point. She remembered seeing the same person previously, saying he was wearing a hooded sweatshirt and walked past them when they had first arrived. Chapa explained she is five foot, six to seven inches tall in height and she felt the attacker was around five foot, eight to nine inches tall. He made them go down under the overlook; he went first, followed by Olgin, and then Chapa. Once down below, he made Chapa duct tape Olgin's face and then do the same to herself, but she left an area over her left eye open so she could see. He told them to drop their pants, squat down, and he raped Chapa from behind. She explained that she was terrified. After her assault, he told them both to stand up, and then she heard a gunshot close to her right ear, which made her jump, and then she blacked out. At some point in the night, she remembers waking up on her back. Chapa said she kept trying to get up but could not. She also stated that her left side felt "different," and she recalled when she would fall trying to stand, she would hit her head on the thorns on the ground. The next thing she remembered was waking up in the hospital and could not feel anything. She recalled telling the police it was one man, but does not remember saying he smelled like cigarettes. Chapa explained the man was wearing a see-through mask pulled up above his mouth. She also testified that she thought the gun was silver, but stated she was confused.

25

On cross-examination, Chapa testified that she first used sign language to communicate with the police, then wrote words on a notepad. When she was released from the hospital, she retraced her steps with the police, although she stated she did not remember the statements on the video of her at the scene. She remembered that when she and Olgin were walking on the path, there was a guy and girl walking in front of them, holding hands, and that the guy was taller than the girl. Chapa said they never went to a Chili's restaurant that night or got into an argument with a waitress.

The State's final witnesses were Melchor and his mother, Nancy Melchor. Melchor testified that he first met Strickland in 2010 in Corpus Christi through Strickland's parents. They became friends, and Melchor offered to let Strickland and his wife stay with him in Utah in January 2013. Melchor stated that on June 22, 2012, he was at his annual military training in California. He explained that he first saw the letter when interviewed in Utah by the Texas Rangers and was disgusted by it. The photo attached to the letter was a cropped photo of him. Melchor stated that the original photo depicted him and Strickland and was located on Strickland's wife's Facebook page. He also stated that Strickland was a smoker. On cross-examination, Melchor stated that he was not mad at or embarrassed by Strickland. He also stated as soon as he saw his picture attached to the letter, he knew Strickland wrote it.

Nancy stated that Strickland lived with her and Melchor. She remembered Strickland saying one time he was a "hitman" and he had "killed people." His wife told him to "shut up" and took him upstairs, but she thought he was making it up.

26

The State rested and defense counsel asked for a directed verdict. Defense counsel argued that Strickland was never placed at the scene; that the only evidence was the cartridges, which had been "severely mishandled" by the police; and that Strickland's statement did not fit the actual facts. The trial court denied the directed verdict.

### 2. Defense's Case-in-Chief

Former San Patricio County Sheriff's Deputy Russell Kirk testified that he showed Chapa a photo lineup in June of 2014. Strickland's photo was included in the lineup. Chapa picked another photo stating that she was about fifty percent sure it was that man. On cross-examination, Kirk agreed that the video of Chapa viewing the lineup showed her taking a long time looking at photo three, which she ultimately selected, and photo four, which was Strickland's.

Steven Zemo testified that he had spoken to Strickland on the evening of June 22, 2012, at the local Chili's restaurant. He said he could not remember anything else from around that time due to the amount of time that had passed, and he only remembered seeing Strickland because he had photographs taken from that evening.

Christina Eastman and Monique Ybarra were former neighbors of Spellman. Eastman explained that when Spellman lived next door, she noticed he would do "strange things," like sit in front of his house or the vacant corner lot and "watch" people. She would also see him walk to Violet Andrews Park almost nightly. Eastman stated the night of the murder, her daughter, Ybarra, had run away and told her "things" about Spellman. Eastman was home when the police searched the home Spellman stayed at, and she

27

tried to tell them she had information[10] about the case, but she stated that no one ever contacted her.

Ybarra testified she was wary of Spellman based on information she had heard. Ybarra would see Spellman sitting outside his home at all hours of the night seemingly in a "daze." She always saw him smoking and she saw him at Violet Andrews Park many times. On June 22, 2012, Ybarra stated she ran away from home and she was supposed to meet some friends at Violet Andrews Park around 2:30-3:00 AM. When she arrived at the park, she saw Spellman sitting in the playground, so she went to another area of the park. Ybarra told her mother, after seeing the first sketch released by police, that the person in the sketch was Spellman. She also said after the shooting, she would see Spellman sitting outside at night, sometimes staring at her home. On cross-examination, she stated she went to the Portland Police Department shortly after the murder and talked to someone, but does not know if they got a statement from her. Ybarra learned about the case against Strickland when defense's investigators came to her mother's house and she spoke with them.

Next, Randy Babineaux, one of Spellman's supervisors at Gentry Company commercial plumbing, testified. Babineaux explained they were working a job at the naval air station and that they had access to black duct tape, because it works better in his line of work than grey duct tape. He stated that most people he works with have black duct tape at their homes. On cross-examination, Babineaux agreed that Spellman was very tall, around six feet, eight inches tall.

---

[10] The specific "information" Eastman was refering to was not discussed in front of the jury.

Forensic scientist Robin Castro, a DNA analyst in the DPS-Corpus Christi lab, talked about Spellman's DNA found on seven Camel Crush Bold cigarettes and a Monster can. Castro said that Strickland was excluded as a contributor to items she tested. She also tested a pair of black gloves collected when Spellman's home was searched, and that Spellman was a contributor to the DNA sample found on both gloves. One glove contained a mixture of DNA, but she did not know who the other contributor was. Castro agreed that there could be a sexual assault without DNA present.

Officer Chavez was recalled by the defense. He talked about a conversation he had with Spellman's father, a law enforcement officer in Nevada, where his father brought up the height discrepancy between the suspect described by Chapa and Spellman. Officer Chavez went and measured the indentation by the overlook observation deck and stated that it was close to eleven inches. He explained he knew where the attacker was standing based on speaking to Chapa when she did a walk-through at the park ten months after the murder. He also recalled that Chapa told him about a man and woman walking through the park and a height difference between them. Chapa told Officer Chavez she felt that might be the man who did this to them. He also agreed with defense counsel that Chapa repeatedly stated the gun was silver and the man smelled like cigarette smoke.

Spellman's former girlfriend, Dickey, talked about dating Spellman in 2012. She stated that she met Spellman at the Speedy Stop convenience store where she worked. On June 22, 2012, she said she picked Spellman up at the Voorheeses' home, drove around, and then came back to Portland around 11:00 PM. They got food at

Whataburger and then went to Violet Andrews Park. She explained that they smoked marijuana and she then took Spellman home. She said she went to Olgin's memorial, and she and Spellman broke up shortly thereafter. Dickey stated that she found out about Spellman's Nevada criminal history when she went to the police department. She also talked about a sexual encounter between the two, where he placed his hands around her neck, and she felt obligated to continue out of fear. She said now she is terrified of Spellman. She also recalled a time after they broke up when Spellman kept calling her to meet him at Sunset Lake (near Violet Andrews Park) after dark. On cross-examination, Dickey stated they had already broken up when the search warrant was executed on her trailer and that the gun the police found belonged to her dad's best friend, who owned the trailer.

Defense expert Dr. Richard Ofshe, a social psychologist, testified about Strickland's video statement. He explained that he has researched and studied interrogation techniques and said there is a line that law enforcement should try not to cross. An investigator can lay out a version of the crime and try to get a suspect to adopt that version. If it is not just feeding information to the person, then it can be a confession. Officers should go through and eliminate information, such as information given to the public and information "fed" to the suspect, and try to get down to the information volunteered by the suspect. If it seems like the suspect is guessing or making up a story, then that could show a person who is desperate.

Dr. Ofshe stated that he reviewed the video statement, the letter allegedly written by Strickland, and Strickland's military mental health evaluation from three years prior.

After reviewing the video, Dr. Ofshe concluded that Ranger Aguirre used what he characterized as typical "evidence ploys,"[11] such as talking about the ballistics evidence, stating that they believed that Strickland threatened his wife to cause her to deliver the letter, a rape kit was collected, and that they found a GPS location on the photo used in the letter. The ranger also threatened economic harm to Strickland's parents by stating they would have to search and close down their businesses, and he threatened to arrest Strickland's wife. The officers then talk about possible scenarios, blame the victims, and try to mitigate the act in an effort to get Strickland to confess. According to Dr. Ofshe, Strickland appears to make up a story, then demands a "death deal." Every time Strickland states he will tell them what happened, he discounts the story afterwards. Dr. Ofshe felt that he showed similar characteristics three years earlier when evaluated by the military. He believed that Strickland tried to make a "death deal" twenty-four times during the interrogation. On cross-examination, Dr. Ofshe states that he has seen good interrogations where he has told lawyers there were no grounds to complain about, and although he is testifying as a defense expert here, he has consulted for both prosecution offices and defense firms many times.

The defense's other expert, Greg Karim, was a firearm and toolmark expert. He explained how he analyzes ballistics. He reviewed Hitchcock's findings regarding the two bullet fragments, State's exhibit 19, which Hitchcock believed were fired from the

---

[11] Dr. Ofshe explained an "evidence ploy" normally is something that involves an interrogator claiming to have a piece of evidence that links the defendant to the crime. He said that calling "something an evidence ploy" does not mean the assertion is correct or incorrect. It is simply the "interrogator using this element to lead the person to believe that their situation is hopeless" in order to elicit a statement or confession out of them.

same gun. Karim stated that "what that means in my head is that they fired out of the same barrel." Karim understood Hitchcock's findings to say that "[State's exhibit 19] and a [bullet] jacket were fired from the same gun." Based on the conclusions in Hitchcock's reports, Karim stated that the Glock barrel submitted should be considered an "elimination" which he explained meant there was no way it was fired from that barrel. Karim said that Hitchcock stated that the Storm Lake barrel was "inconclusive" which meant it was a most likely a different gun with similar class characteristics. He also stated that he reviews other crime labs, and most lab accreditations require that anything used to examine or document findings must be retained. On cross-examination, Karim agreed that he did not test any of the evidence in the case, but only reviewed the reports. He stated that if he were to testify about whether a particular casing was fired from a certain gun, he would do his own testing. Karim also said he did not have an "objection" to Hitchcock's opinion.

Strickland also called John Hornsby, the supervisor of the forensics services division with the Corpus Christi Police Department. Hornsby testified that some of his people had assisted in gathering evidence at the crime scene. He explained that they have their own firearms testing lab, where they can test-fire weapons, and they have two firearms examiners available. He agreed it was about a ten-minute drive between the Portland Police Department and his lab, and he offers his lab to other law enforcement agencies. Hornsby stated that although there was no requirement that they take photographs as they conduct their analysis, it is a requirement that they preserve any documentation they used. He also agreed that no one from the Portland Police

Department ever contacted him asking to test-fire any weapons.

Strickland's insurance agent, Rosie Parchman, testified that she spoke to Strickland about the murder after it occurred because she felt awful that it happened close to their neighborhood. When he mentioned he saw a white car speeding by his parents' house, she stated she realized it was her roommate's vehicle and she remembered they passed Strickland's parents' home around 12:00 AM that morning.

Kiki Koumbis, a park patron, stated that she was walking her dog at Violet Andrews Park on June 22, 2012 around 9:00 PM. She saw a tall man, whom she identified in a photo lineup as Spellman, whom she sensed was evil. She stated she was fearful of him because she thought he had a gun, but felt better when she saw Olgin and Chapa walking on the sidewalk. She said Chapa stopped to pet her dog. But she explained she did not go to the police after she heard of the murder because she was afraid to get involved.

### 3. State's Rebuttal

The State brought Officer Chavez to testify in rebuttal. He stated that Spellman had returned to Nevada when they executed the search warrant on his home. Officer Chavez believed that Spellman had left all his clothing, bedding, everything, and only retuned to Nevada with a small carry-on bag.

Johnny Green testified that Dickey lived with his daughter at the trailer that was searched. The day of the search, he gave the police a silver .45 Auto-Ordnance pistol that he found on November 10, 2012, near the Rockport, Texas bypass. He explained that after he found the pistol, he bought a clip, grip, and bullets for the gun, but the warrant was executed a few days later. He stated he did not know Spellman.

33

Chapa also testified in rebuttal. She stated the gloves found at Spellman's house were not the same as the ones she remembered from the murder because they did not have the Under Armour logo on them. Chapa said she did not see a lady walking a dog and she did not stop to pet a dog when she and Olgin were in the park.

### 4. Verdict

Defense counsel again asked for an instructed verdict, stating that the State never put Strickland in the park; the gun connected only to the casings, but not the projectiles; and Strickland's statement had no value. The trial court denied the request. The State abandoned paragraph two of the indictment that alleged the robbery of Chapa. The jury found Strickland guilty of capital murder and he was sentenced to life imprisonment in the Texas Department of Criminal Justice–Institutional Division. *See id.*

### 5. Motion for New Trial and Motion for DNA Testing

The State and defense counsel agreed to a motion to allow DNA testing of a pubic hair found on Chapa. The hair was previously located, but advancements in DNA testing did not become available until after Strickland's trial had already started. Based on the new technology, the defense requested that it to be tested. The trial court granted the motion.

In the motion for new trial hearing, Strickland raised issues relating to the assistant district attorney's license being suspended during the trial; not receiving the entire chain of custody documents from the State; and an allegation of jury tampering. After testimony from defense counsel and multiple witnesses, the trial court denied the motion for new trial. This appeal followed.

34

## II. SUFFICIENCY OF THE EVIDENCE

By his second and third issues, which we address first, Strickland argues the evidence was insufficient to sustain his conviction for capital murder.

## A. Standard of Review

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018); *see Jackson v. Virginia*, 443 U.S. 307, 313 (1979). In reviewing the sufficiency of the evidence, an appellate court must ask whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Nisbett*, 552 S.W.3d at 262 (quoting *Jackson*, 443 U.S. at 319). This standard gives full play to the responsibility of the factfinder "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *Jackson*, 443 U.S. at 319). An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence. *Nisbett*, 552 S.W.3d at 262; *Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016). A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally. *Nisbett*, 552 S.W.3d at 262.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Id.*; *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is

sufficient to support the conviction. *Nisbett*, 552 S.W.3d at 262. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Id.*; *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and a reviewing court is not to substitute its judgment as to facts for that of the jury as shown through its verdict. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). When the reviewing court is faced with a record supporting contradicting inferences, the court must presume that the jury resolved any such conflict in favor of the verdict, even if it is not explicitly stated in the record. *Id.*

The jury returned a verdict finding Strickland "guilty of the offense of capital murder as charged in the indictment." A reviewing court must measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

## B.   Applicable Law

Under a hypothetically correct jury charge, a person commits capital murder when he: (a) commits murder as defined under § 19.02(b)(1) and; (2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping,

36

burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). The State alleged that Strickland committed capital murder by murdering Olgin while committing either the aggravated sexual assault or kidnapping of Chapa. *See id.*

Kidnapping occurs when a person knowingly or intentionally abducts a person. *Id.* § 20.03(a). To "abduct" means to restrain a person with the intent to prevent his liberation by secreting or holding him in a place where he is not likely to be found, or by using or threatening to use deadly force. *Id.* § 20.01(2). To "restrain" means to restrict the person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person. *Id.* § 20.01(1). The State may show a lack of consent by proof of force, intimidation, or deception. *Id.* § 20.01(1)(A). The Texas Court of Criminal Appeals has explained that the offense of kidnapping "is complete when the restraint is accomplished and there is evidence that the defendant intended to restrain the victim by either secretion or the use or threat to use deadly force." *Swearingen v. State,* 101 S.W.3d 89, 95 (Tex. Crim. App. 2003) (citing *Mason v. State,* 905 S.W.2d 570, 575 (Tex. Crim. App. 1995)).

**C.      Discussion**

The jury heard testimony from multiple witnesses over multiple days, as laid out in the background section of this memorandum opinion. Although Chapa, the surviving witness, did not pick Strickland out of the photo lineup, nor did any witness place him at the crime scene, the jury could have inferred his guilt from other circumstantial evidence. *See Nisbett*, 552 S.W.3d at 262. As noted, the offense of kidnapping is complete when

the restraint is accomplished and there is evidence that Strickland intended to restrain Chapa by either secretion or the use or threat to use deadly force. *Swearingen*, 101 S.W.3d at 95. Chapa stated that she and Olgin were approached by a man in Violet Andrews Park, who was slightly taller than she was and had dark hair. Chapa testified that the man put a gun to the girls' backs and made them follow him down the embankment into a secluded area of the park. There, he had Chapa bind Olgin and then herself with black duct tape around their faces, and Chapa stated that he then sexually assaulted her. Chapa told the jury that following the sexual assault, she heard a gun fire next to her ear and shortly thereafter, blacked out. Chapa's testimony establishes the elements required of kidnapping since the girls were forced down the embankment by gunpoint and additional witnesses confirmed Olgin's death by being shot.

The State presented evidence from its ballistics expert, Hitchcock, who explained that the test-fire casings and the casings found at the scene were fired from the same firearm. Hitchcock explained the procedure he used to identify which firearm the casings were shot from and how later, he tested Strickland's Glock .45 firearm when he received it at the DPS crime lab. Hitchcock testified that he corroborated the findings based on the breech face marks, the firing pin impressions, and the firing pin drag marks on the casings, and, in his expert opinion, the four cartridge cases (two test-fired casings from Officer Chavez and two casings found at the crime scene) were fired from Strickland's Glock .45 firearm.

Additionally, the State presented evidence from Calderon, who explained how he located certain distinct phrases from the letter Chapa's father received on Strickland's

laptop computer.   Calderon explained that the program he utilized, which captures words

and phrases through spell check and places them on a separate document, found:

What do you want to know?

His name is Christobal Melchor, Sergeant Chris Melchor, Sergeant Mel.

You can give this information to the police, but we know how that will turn out.

I however do not work for free, and I will not be handling him.

Soon he will be returning to this area to be close to his children, but your daughter has seen his face and he is reaching out to make this problem go away.

Although Calderon stated that he could not say who wrote the letter based on what he

found, it was in the jury's discretion to believe that, based on the evidence presented,

Strickland wrote and delivered the letter to Chapa's father.   *See Montgomery*, 369

S.W.3d at 192.

Portland Police Department officers testified that evidence recovered from

Strickland's arrest in Utah showed items consistent with items that could be used in a

kidnapping or aggravated sexual assault.

Strickland gave a videotaped statement, played for the jury, where he told the

officers that he raped and shot the girls after they were disrespectful to his wife at Chili's.

Strickland also asked to be given the death penalty within a five-day period multiple times

throughout his statement.   It was also within the jury's province to believe or disbelieve

Strickland's statement following his arrest.   *See id.*

Additionally,   the   jurors   heard   extensive   testimony   about   Spellman,   his

whereabouts during his time in Portland, his previous criminal actions, and the possibility

39

that he committed this act.   The jury heard the defense's theory of the case and convicted Strickland.   When the reviewing court is faced with a record supporting contradicting inferences, we must presume that the jury resolved any such conflict in favor of the verdict.   *See id.*

When a trial court's charge authorizes the jury to convict on several different theories, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of these theories.   *Swearingen*, 101 S.W.3d at 95.   Having concluded that the evidence is sufficient to support the jury's finding that Strickland committed murder in the course of a kidnapping, we need not reach Strickland's issue concerning the sufficiency of the evidence of sexual assault to affirm the judgment.   *See Guevara v. State*, 152 S.W.3d 45, 52 (Tex. Crim. App. 2004); *see also Reyes v. State*, 491 S.W.3d 36, 44–47 (Tex. App.—Houston [14th Dist.] 2016, no pet.).   We overrule Strickland's second and third issues.

### III.   DEFECTIVE INDICTMENT

By his ninth issue, Strickland alleges the indictment was defective by failing to charge capital murder in paragraph one.   He states that paragraphs one and three of the indictment were submitted to the jury in the jury charge.   Strickland argues that paragraph one of the indictment is an invalid charge, while paragraph three was a valid charge.   However, Strickland challenges that by submitting both paragraphs to the jury, the conviction is invalid.

40

## A.    Applicable Law

The presentment of a valid indictment vests the district court with jurisdiction of the cause. *Jenkins v. State*, No. PD-0086-18, __S.W.3d__, 2018 WL 6332219, *2 (Tex. Crim. App. 2018); *see* TEX. CONST. art. V § 12.   Even if an indictment has a substantial defect, it can still qualify as an indictment that vests a district court with jurisdiction. *Jenkins*, 2018 WL 6332219 at *3.   To meet the definition of indictment under Article V, § 12(b) of the Texas Constitution, the indictment must (1) charge a person, and it must (2) charge the commission of an offense.   *Id.*

Texas Code of Criminal Procedure Article 1.14(b) mandates that defendants must object to errors in the form or substance of an indictment "before the date on which the trial on the merits commences."   TEX. CODE CRIM. PROC. ANN. art. 1.14(b).   A defendant must object to any error in the indictment before the day of trial and certainly before the jury is empaneled.   *Id.*   Article 1.14(b) was amended in 1985 to require a defendant to object to error in the indictment.   *See Teal v. State*, 230 S.W.3d 172, 177 (Tex. Crim. App. 2007).   Thus, all substantive defects in the indictments are waivable under the statutes and these defects do not render the indictment void.   *Id.*   Additionally, the Texas Court of Criminal Appeals also held that the critical determination is whether the trial court (and reviewing appellate courts) and the defendant can identify what penal-code provision is alleged and whether that penal-code provision is one that vests jurisdiction in the trial court.   *Kirkpatrick v. State*, 279 S.W.3d 324, 328 (Tex. Crim. App. 2009); *Teal*, 230 S.W.3d at 180.

41

**B.     Discussion**

The indictment stated:

Paragraph One

COMES NOW THE GRAND JURORS for the County of San Patricio, State aforesaid, duly selected, organized, impaneled and sworn as such at the July Term, A.D. 2014, of the 36th Judicial District Court, in and for said County, a quorum thereof being present, upon their oaths present in and to said Court that DAVID MALCOLM STRICKLAND on or about the 22nd day of June, A.D. 2012 and anterior to the presentment of this Indictment, in the County and State aforesaid, did then and there intentionally cause the death of an individual, namely Mollie Olgin, by shooting Mollie Olgin in the head with a firearm, and the defendant was then and there in the course of committing or attempting to commit the offense of sexual assault of Mary Kristene Chapa.

Paragraph Three

AND THE GRAND JURORS AFORESAID, upon their oaths aforesaid, do further presented [sic] in and to said Court that DAVID MALCOM STRICKLAND on or about the 22nd day of June, A.D. 2012 and anterior to the presentment of this Indictment, in the County and State aforesaid did then and there intentionally cause the death of an individual, namely Mollie Olgin, by shooting Mollie Olgin in the head with a firearm, and the defendant was then and there in the course of committing or attempting to commit the offense of kidnapping of Mary Kristene Chapa.

In a capital murder case, the State must prove both that the defendant intentionally caused the death of an individual *and* that he "committed this intentional murder while in the course of committing or attempting to commit" the aggravating felony.   *Patrick v. State*, 906 S.W.2d 481, 492 (Tex. Crim. App. 1995); *see also Riley v. State*, 447 S.W.3d 918, 922 (Tex. App.—Texarkana 2014, pet. ref'd.).   The indictment was sufficient to allow the trial court and Strickland to know which penal code provision was being charged. *Kirkpatrick*, 279 S.W.3d at 328.

In any event, based on the holdings in *Teal* and *Kirkpatrick*, since Strickland did not object prior to the day of trial or before the jury was empaneled, he waived any compliant regarding any deficiencies in the indictment. *See Teal*, 230 S.W.3d at 177*; see also Kirkpatrick*, 279 S.W.3d at 328. We overrule Strickland's ninth issue.

### IV.    ASSISTANT DISTRICT ATTORNEY'S BAR LICENSE

By his first issue, Strickland argues that the assistant district attorney's bar license was suspended during the pendency of his trial, and therefore, his conviction should be null and void.

### A.    Applicable Law and Discussion

The State agrees with Strickland that the assistant district attorney's bar license was suspended during the trial due to non-payment of bar dues. However, at the motion for new trial hearing, the State explained that the assistant district attorney had corrected the issue and was current with his bar dues at that time, so his bar license had been reinstated.[12]

The State Bar of Texas rules state that if a member has not paid the fees and assessments before sixty days after the mailing of the notice of default, "the defaulting member shall automatically be suspended from the practice of law. Any practice during such suspension shall constitute professional misconduct and subject the member to discipline." TEX. STATE BAR. R. art. III, § 5, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, art. III, § 6 (2019).

---

[12]    The assistant district attorney's license was suspended on September 1, 2016, for non-payment of bar dues. The jury was selected on September 15, 2016, and the trial was held from September 19 through September 28, 2016. During the motion for new trial hearing, it was agreed by both parties that the assistant district attorney's bar license had been reinstated prior to October 27, 2016.

43

When a member, who has been suspended for nonpayment of fees or assessments, removes such default by payment of fees or assessments then owing . . . the suspension shall automatically be lifted and the member restored to former status. Return to former status shall be retroactive to inception of suspension, but shall not affect any proceeding for discipline of the member for professional misconduct.

TEX. STATE BAR. R. art. III, § 7, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A, art. III, § 10 (2019).

Although Strickland is correct that "an assistant prosecuting attorney must be licensed to practice in this state and shall take the constitutional oath of office," he points us to no case law, and we find none, that states that assistant district attorneys are held to different standards than other practicing attorneys in Texas. *See* TEX. GOV'T CODE ANN. § 41.103. Once the assistant district attorney's bar dues were paid and his bar license was reinstated, he was returned to his former status and the return was retroactive to the day of suspension prior to the start of Strickland's trial. *See* TEX. STATE BAR. R. art. III, § 7. We overrule Strickland's first issue.

## V. BALLISTICS EVIDENCE

By his fourth, fifth, and sixth issues, Strickland alleges that the State destroyed ballistics evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and his rights to due process, effective counsel, and confrontation. By his seventh issue, Strickland claims that the State failed to correct false testimony from its ballistics evidence expert.

### A. Applicable Law and Discussion

Strickland alleges that the State's ballistics expert destroyed evidence because he testified that he did not preserve photographs of his microscopic examination of the firearms evidence. Defense counsel complained that he could not cross-examine or

confront the witness without the photos and that the defense expert could not review the State's examination of the ballistics evidence. Strickland also alleges that the State was required to correct any false testimony of its ballistics expert. He claims that the State's expert testified on voir dire, outside the presence of the jury, that he would not use a level of certainty that casings or bullets came from a certain gun, but would state in "his expert opinion" if he believed they did or did not.

### 1. Violation of Rights

The United States Supreme Court in *Brady v. Maryland* held that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Texas Court of Criminal Appeals has held that to find reversible error under *Brady* and *United States v. Bagley*, a defendant must show that:

(1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith;

(2) the withheld evidence is favorable to him;

(3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.

*Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011) (citing *Brady*, 373 U.S. at 87; *United States v. Bagley*, 473 U.S. 667 (1985)). The court of criminal appeals also requires that the evidence central to the *Brady* claim be admissible in court. *Pena*, 353 S.W.3d at 809; *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993).

45

The State's expert, Hitchcock, testified that he takes digital photos on a microscope of the comparisons he made as documentation for the reviewer in his lab who evaluates his work. Hitchcock stated that the photos are not evidentiary, so they are not retained and that he does not retain them because they would be misleading to a jury. He also explained that he does not delete them to prevent a defense expert from reviewing his work; the defense expert has the physical evidence to review independently and for their own conclusions regarding the ballistics evidence. Strickland's ballistics expert testified that he did not conduct any independent tests; he reviewed the State's expert's reports and did not have any objection to them.

The State's "failure to preserve potentially useful evidence" does not violate due process unless the defendant shows that the loss of evidence resulted from "bad faith on the part of the police." *Neal v. State*, 256 S.W.3d 265, 280 (Tex. Crim. App. 2008) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). Potentially useful evidence is described as evidentiary material that, when subjected to tests, "might have exonerated the defendant." *Youngblood*, 488 U.S. at 57–58. As the State points out in its brief, the evidence Strickland complains the State destroyed was photographs of evidence. The actual evidence was preserved and was available for testing and evaluation. Therefore, no due process violation occurred.

In order to establish a *Brady* violation, Strickland must demonstrate the evidence withheld was "favorable." Favorable evidence is that which, if disclosed and used effectively, "may make the difference between conviction and acquittal." *Ex parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012) (quoting *Bagley*, 473 U.S. at 676)

46

("Exculpatory evidence is that which may justify, excuse, or clear the defendant from fault, and impeachment evidence is that which disputes, disparages, denies, or contradicts other evidence."); *see Harm v. State*, 183 S.W.3d 403, 408 (Tex. Crim. App. 2006). Strickland complains of missing photographs of the ballistics evidence. However, he has not shown that the photographs are favorable to him. *See Ex parte Miles*, 359 S.W.3d at 665. As discussed above, the actual ballistics evidence was preserved and available to Strickland and his expert to examine and conduct their own testing and evaluation. Any information acquired from the State's ballistic expert's photographs could have also been obtained by examining the actual pieces of evidence.

Strickland, additionally, was allowed to cross-examine Hitchcock and question him about his photographs and why he did not preserve them. His right to confrontation was not violated. *See Crawford v. Washington*, 541 U.S. 36 (2004) (stating the standard of confrontation violations). Defense counsel was able to cross-examine the State's ballistics expert and argue their theory of the case that the gun used was not Strickland's. Strickland cannot prove he was harmed by the destruction of Hitchcock's photographs. We overrule Strickland's fourth, fifth, and sixth issues.

### 2. False Testimony

During voir dire, outside the presence of the jury, defense counsel asked Hitchcock the following:

Defense:     When you give your opinion in the case, what type—are you going to give some type of certainty in your opinion?

Hitchcock:   I will say that it is my—what I call certainty. No, sir. I say it is my expert opinion that [sic]. And that's how I preface it. I do not put any level of certainty in it.

Defense:       You are not going to use terms such as unique?

Hitchcock:    I will say, it is my expert opinion this bullet was fired from that
firearm.   Or this cartridge case was fired from that firearm.
Or, I could neither identify or eliminate.   I will testify that it is
in my expert opinion.

Defense:       So no expression of certainty?

Hitchcock:    No, sir, there is not.   I have never used that even before [sic]
report said it was bad.   I realized that already myself.

Defense:       So you know where I am going?

Hitchcock:    Oh yes, sir.   I have never used the term reasonable degree
of scientific certainty, because I never understood what that
term meant.   If I couldn't understand it, I could not stand on
the witness stand and say something that I did not know what
it means.

During testimony in front of the jury, Hitchcock stated:

It is my expert opinion that those four cartridge cases were fired in that
firearm; the Glock pistol.

. . . .

Yes, sir, it is my expert opinion based upon my training and experience, that
these four cartridges were fired in this gun.

In order to determine whether a particular piece of evidence has been demonstrated to be false, the court of criminal appeals has explained that the relevant question is whether the testimony, taken as a whole, gives the jury a false impression. *Ex parte De La Cruz*, 466 S.W.3d 855, 864 (Tex. Crim. App. 2015).   The court has consistently held that the testimony "need not be perjured to constitute a due process violation; rather it is sufficient that the testimony was false."   *Id.* (quoting *Ex parte Chavez*, 371 S.W.3d 200, 208 (Tex. Crim. App. 2012)).   That is because a false-evidence due-

process claim is "not aimed at preventing the crime of perjury—which is punishable in its own right—but [is] designed to ensure that the defendant is convicted and sentenced on truthful testimony." *Id.* at 866 (quoting *Ex parte Weinstein*, 421 S.W.3d 656, 666 (Tex. Crim. App. 2014)).

Although Strickland contends that the State had an obligation to correct what he deems to be Hitchcock's "false testimony," we disagree. During a voir dire examination, conducted during trial but outside of the presence of the jury, Hitchcock told defense counsel he would not testify to a "certainty" that a certain firearm was used. He explained that he would use phrases such as "his expert opinion," which is exactly the way he testified. Hitchcock explained that based on his "experience and training," his expert opinion was that Strickland's Glock .45 fired the four casings submitted. The testimony was not false and not in opposition to the testimony Hitchcock presented during voir dire. We overrule Strickland's seventh issue.

## VI.   DEFENSIVE THEORY

By issues ten, eleven, and twelve, Strickland alleges he was denied his right to present a complete defense and the trial court abused its discretion when it suppressed Chapa's video walk-through of the crime scene and Spellman's interview on hearsay grounds. By issues thirteen and fourteen, he argues the trial court denied his compulsory process by issuing a faulty long-arm subpoena.

### A.    Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Coleman v. State*, 428 S.W.3d 151, 157 (Tex. App.—Houston [1st Dist.]

49

2014, pet. ref'd). We will not reverse the trial court's ruling unless it falls outside of the zone of reasonable disagreement. *Alcala v. State*, 476 S.W.3d. 1, 22 (Tex. App.— Corpus Christi–Edinburg 2013, pet. ref'd.); *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002). In applying the abuse of discretion standard, we may not reverse a trial court's admissibility decision solely because we disagree with it. *Coleman*, 428 S.W.3d at 157. We will not disturb a trial court's evidentiary ruling if it is correct on any theory of law applicable to that ruling. *Id.*

## B.     Chapa's Walk-Through

Strickland attempted to introduce a video of Chapa's walk-through of the crime scene into evidence through Officer Chavez. The State objected on hearsay grounds, stating that Chapa would testify later at trial, and the trial court sustained the objection. *See* TEX. R. EVID. 801. Generally, the hearsay rule excludes any out-of-court statements offered by a party at trial to prove the truth of the matter asserted in the statement. *See id.* R. 803. The video, taken ten months after the incident, depicted Chapa explaining what happened on June 22, 2012. However, when Chapa later testified, Strickland did not attempt to introduce the video through her. With Chapa testifying, the video could have fallen under one of the hearsay exceptions found in Rule 803 of the Texas Rules of Evidence. *See id.* Strickland chose not to introduce the video through Chapa at a later time. The trial court did not abuse its discretion by sustaining the initial hearsay objection to Officer Chavez, who was not the main declarant in the statements made in the video. *See id.*

50

## C.     Spellman's Interview

Texas Rule of Evidence 803(24) refers to an exception for statements made against interest.   *See id.* R. 803(24).   The hearsay exception for statements against penal interests stems from the common sense notion that people ordinarily do not say things that are damaging to themselves unless they believe they are true.   *Walter v. State*, 267 S.W.3d 883, 890 (Tex. Crim. App. 2008).

The rule sets out a two-step foundation requirement for admissibility.   *Id.*   First, the trial court must determine whether the statement, considering all circumstances, subjects the declarant to criminal liability and whether the declarant realized this when he made that statement.   *Id.* at 890–91.   Second, the court must determine whether there are sufficient corroborating circumstances that clearly indicate the trustworthiness of the statement.   *Id.* at 891.   Statements against penal interest fall into three general categories:   (1) those that inculpate only the declarant; (2) those that inculpate equally both the declarant and a third-party, such as a co-defendant; and (3) those that inculpate both the declarant and third party, but shift blame by minimizing the speaker's culpability. *Id.*

Spellman's recorded statement was from an interview with law enforcement officers while he was in custody in Nevada for an unrelated offense.   Spellman was aware that statements he made could subject him to criminal liability in Texas, especially since the officers told him they had considerable evidence tying him to the murder and he would be facing a possible death penalty in Texas.   Although Spellman admits in the interview to being at Violet Andrews Park the night of the murder, he does not specifically

51

admit to any wrongdoing which would subject him to criminal liability. He stated he was in the park with Dickey, but then she dropped him off at his house around 11:30 PM to 12:00 AM, and he went to sleep. He claimed multiple times that he does not remember anything else that happened that night.

Strickland alleges that statements such as below should have caused the interview to be admitted:

| | |
|---|---|
| Officer: | You cooperate, you get a good deal. |
| Spellman: | What's a good deal for this? Twenty years in prison? That's what I'm saying . . . . Even if I did say, ok yes I did this, this is what happened, blah blah, even if I did say that, and I did cooperate, I would still be doing twenty years in prison. |

. . .

| | |
|---|---|
| Officer: | How did you refer to yourselves during your crime here in Nevada? |
| Spellman: | With numbers. |
| Officer: | And how do you think these girls were identified? |
| Spellman: | With numbers, I was told that. |

. . .

| | |
|---|---|
| ADA: | Ok, what do you need bud? |
| Spellman: | I just wanted to know how much time I would be looking at, if I did. . . . |
| ADA: | Lemme put it this way, there are two types of murders in Texas, this case would be considered a capital murder, alright? What are the two types of punishments on capital murder? You can get the death penalty on a capital murder. I've talked to my boss, I've talked to their boss, if you want to tell these guys exactly what happened, I'm prepared to take the death penalty off the table. |

52

. . .

Spellman:    And then it's still life in prison?

. . .

Spellman:    I'm going to die in prison regardless.

. . .

Officer:    The polygrapher asked you, 'Is there any other time you've ever shot anybody?'

Spellman:    No, so I guess that was like a double-edged question.

Officer:    Have you ever done anything like this to any other women?

Spellman:    No, that's still a double-edged question.

However, Spellman never makes statements that directly implicate him in the offense. In order to attempt to show Spellman committed the crime, Strickland still must show that his proffered evidence regarding the Spellman as the alleged perpetrator is sufficient, on its own or in combination with other evidence in the record, to "show a nexus between the crime charged and the alleged alternative perpetrator." *Wiley v. State*, 74 S.W.3d 399, 406 (Tex. Crim. App. 2002). The statements made in the interview are not sufficient to show the nexus required, and Strickland was allowed to introduce other evidence to support his theory that Spellman was the alleged perpetrator. *Id.*

Spellman's statements during this interview did not subject him to criminal liability and were not statements against interest. The trial court did not abuse its discretion by not allowing the introduction of the interview. We overrule Strickland's tenth, eleventh, and twelfth issues.

53

**D.     Unavailable Witness, Compulsory Process, and Long-Arm Subpoena**

Strickland argues in his thirteenth and fourteenth issues that Spellman was an unavailable declarant and his interview should have been admitted into evidence due to a faulty out-of-state subpoena.   The Sixth Amendment right to compulsory process "is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967); *Coleman v. State*, 966 S.W.2d 525, 527 (Tex. Crim. App. 1998).   The defendant must make a plausible showing to the trial court, by sworn evidence or agreed facts, that the witness's testimony would be both material and favorable to the defense.   *Coleman*, 966 S.W.2d at 528.   A defendant who has not had an opportunity to interview a witness may make the necessary showing by establishing the matters to which the witness might testify and the relevance and importance of those matters to the success of the defense.   *Id.*

Texas Rule of Evidence 804(a)(5) states that "a declarant is considered to be unavailable if the declarant is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony."   TEX. R. EVID. 804(a)(5).   In order to establish that a witness is "unavailable" under Rule 804(a)(5), the proponent of the testimony must demonstrate that a good-faith effort was made prior to trial to locate and present the witness.   *Reed v. State,* 312 S.W.3d 682, 685 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

54

Defense counsel had previously issued an out-of-state subpoena to secure Spellman's presence at trial, but that trial date was reset. According to defense counsel, the second time he requested an out-of-state subpoena to issue, he followed the out-of-state subpoena procedure and a Nevada public defender had agreed to help get the subpoena signed by the Nevada trial court. *See* TEX. CODE CRIM. PROC. ANN. art. 24.28. However, there was a typographical error in the issuing judge's name on the subpoena, which the Texas trial judge corrected when he signed it. That correction, supposedly, caused the Nevada judge to reject the subpoena and refuse to sign it. Defense counsel stated that the public defender declined to assist following the refusal, and it was "too close" to the trial date to have a corrected subpoena re-issued. The trial court explained that he had corrected his name and it was frustrating that the Nevada trial court had refused to sign, but it questioned why the error was not corrected and "found it hard to believe that everything that could have been done to serve Mr. Spellman was done to serve Mr. Spellman appropriately." The trial court also found that there were "too many unanswered questions" about the interview with Spellman and was concerned about its reliability, so it sustained the State's objection.[13]

Although Strickland did present the interview to the trial court, he did not establish what Spellman "might" testify to and the relevance and importance to the defense. *See Coleman*, 966 S.W.2d at 528. The trial court allowed significant testimony through other witnesses about interactions with Spellman, his statements to them, and observations of

---

[13] Spellman was given a polygraph examination at some point prior to the interview in Nevada. Spellman supposedly made "incriminating statements" to the polygrapher, which were discussed in the interview recording Strickland sought to admit.

55

him while in Portland. It was also within the trial court's discretion to find there was no "good faith" attempt to serve Spellman with the out-of-state subpoena. *See Reed*, 312 S.W.3d at 685. Defense counsel stating it was "too close" to trial was not sufficient to show Spellman's unavailability. *See id.* We overrule Strickland's thirteenth and fourteenth issues.

## VII. SEARCH WARRANTS

By his fifteenth, sixteenth, and seventeenth issues, Strickland alleges that the search warrant executed for his computer in Helotes lacked probable cause, was executed unreasonably, and was a general warrant due to imprecision.

## A. Standard of Review

The Fourth Amendment to the Constitution mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *Bonds v. State*, 403 S.W.3d 867, 872–73 (Tex. Crim. App. 2013). Probable cause exists when, under the totality of the circumstances, there is a fair probability or substantial chance that contraband or evidence of a crime will be found at the specified location. *Id.* at 873; *see State v. McLain*, 337 S.W.3d 268, 272 (Tex. Crim. App. 2011). The standard is flexible and nondemanding. *Bonds*, 403 S.W.3d at 873.

While an appellate court typically reviews a trial judge's motion-to-suppress ruling under a bifurcated standard, a trial court's determination whether probable cause exists to support a search warrant's issuance is constrained solely to the affidavit's four corners. *Id.*; *McLain*, 337 S.W.3d at 271. When we review a magistrate's decision to issue a

56

warrant, we apply a highly deferential standard of review because of the constitutional preference for searches conducted pursuant to a warrant over warrantless searches. *Bonds*, 403 S.W.3d at 873. Provided the magistrate had a substantial basis for concluding that probable cause existed, we will uphold the magistrate's probable-cause determination. *Id.* The magistrate may interpret the affidavit in a non-technical, common-sense manner and may draw reasonable inferences solely from the facts and circumstances contained within the affidavit's four corners. *Id.*; *see Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007). Appellate courts should not invalidate a warrant by interpreting the affidavit in a hypertechnical, rather than a common-sense, manner. *Bonds*, 403 S.W.3d at 873. When in doubt, the appellate court should defer to all reasonable inferences that the magistrate could have made. *Id.*

## B.    Applicable Law and Discussion

### 1.    Probable Cause

"The cornerstone of the Fourth Amendment and its Texas equivalent is that a magistrate shall not issue a search warrant without first finding 'probable cause' that a particular item will be found in a particular location." *Rodriguez*, 232 S.W.3d at 60. When deciding whether probable cause exists, a "magistrate is not bound by such finely tuned standards as proof beyond a reasonable doubt or by a preponderance of the evidence; rather his sole concern should be probability." *Id.* The probability sufficient to establish probable cause cannot be based on mere conclusory statements of an affiant's belief. *Id.* at 61. Under the Fourth Amendment, probable cause exists when, under the totality of the circumstances, there is a fair probability or substantial chance

57

that contraband or evidence of a crime will be found at a specified location. *Bonds*, 403

S.W.3d at 873. The facts stated in a search-warrant affidavit must be related so closely

to the time of the warrant's issuance that a finding of probable cause is justified. *McLain*,

337 S.W.3d at 272.

Property subject to seizure under article 18.02(a)(10) is often referred to as "mere

evidence." *See* TEX. CODE. CRIM. PROC. ANN. art. 18.02(a)(10); *Foreman v. State*, 561

S.W.3d 218, 234 (Tex. App.—Houston [14th Dist.] 2018, pet. granted). Mere evidence

is evidence connected with a crime, but does not consist of fruits, instrumentalities, or

contraband. *Foreman*, 561 S.W.3d at 234.

A warrant issued under article 18.02(a)(10) is known as an "evidentiary search

warrant" or a "mere evidentiary search warrant." *Id.* Generally,

> to obtain a search warrant for "mere evidence" under article 18.02(a)(10),
> there must be a sworn affidavit setting forth sufficient facts to establish
> probable cause that (1) a specific offense has been committed, (2) the
> specifically described property or items that are to be search for or seized
> constitute evidence of that offense or evidence that a particular person
> committed that offense, and (3) the property or items constituting evidence
> to be searched for or seized are located at or on the particular person, place,
> or thing to be searched.

*Id.* (quoting TEX. CODE CRIM. PROC. ANN. art. 18.01(c)). However, "if a warrant authorizes

a search for both 'mere evidence' and items listed under another ground for search and

seizure, the warrant is not a mere-evidentiary search warrant," and the "additional findings

under (a)(10) are not required." *Jennings v. State*, 531 S.W.3d 889, 893 (Tex. App.—

Houston [14th Dist.] 2017, pet. ref'd).

However, when "too many inferences must be drawn, the result is a tenuous rather

than substantial basis for the issuance of the warrant." *Davis v. State*, 202 S.W.3d 149,

157 (Tex. Crim. App. 2006).

Generally, to support a search warrant for a computer, our sister court has held that there must be some evidence that a computer was directly involved in the crime. *Foreman*, 561 S.W.3d at 237. "When there is no evidence that a computer was directly involved in the crime, more is generally needed to justify a computer search." *Id*. When reviewing the affidavit, we cannot focus on what facts "could or should have been included in the affidavit," but rather must be "on the combined logical force of the facts that actually are in the affidavit." *Duarte*, 389 S.W.3d at 354. The allegations in the affidavit are sufficient if they would "justify a conclusion that the object of the search is probably on the premises." *Ramos v. State*, 934 S.W.3d 358, 363 (Tex. Crim. App. 1996) (quoting *Cassias v. State*, 719 S.W.2d 585, 587 (Tex. Crim. App. 1986)).

Here, there was enough information contained in the affidavit to support the magistrate's finding of probable cause. The affiant, Investigator Vueleman, stated that a letter was received that provided details of the shooting that were "unreleased to the public and would only be known by investigators assigned to the investigation, the victims, or the shooter himself." Investigator Vueleman also indicated in the affidavit that witnesses had told the officers that Strickland had referred to himself as a "hit man" and claimed to have killed people in the past. He specified that:

> Based on your affiant[']s experience it is common for persons engaged in criminal activity to have evidence of their whereabouts at the time of the offense and/or having researched how to facilitate criminal activity, stored on personal electronic communication devices. According to your affiant's training and experience, it is also common for those engaging in criminal offenses to keep diaries and notes about criminal offenses in the written format.

The affidavit requested the following items to be seized:

3.      It is the belief of the affiant that said suspected party has possession of and is concealing at said suspected place the following property: (A) ELECTRONIC MEDIA, to wit: Personal computers and electronic storage devices capable of receiving or storing electrical data, including any external storage devices such as, but not limited to floppy discs and diskettes (including Zip discs and cartridges), digital video discs (DVD's), compact discs (CD's), flash drives ("thumb drives"), external hard drives, tape drives, digital video recorders (including TiVo), internet applicances, video game consoles (including Nintendo Wii), MP3 players (including Apple iPOD), digital cameras and digital camera memory media, magnetic tapes and disks, cellular telephones, personal digital assistants (PDA's), tape recordings, and audio tapes; the hardware necessary to retrieve such data, including, but not limited to, central processing units (CPU's), connecting devices, viewing screens, disc and cartridge drives, tape drives, printers, and monitors; the manuals, with all software, handwritten notes, or printed materials describing the operation of said computers, hardware and software; and, any and all passwords found at the location that may allow access to any of the aforementioned devices and equipment.    (B) FIREARMS, to wit: gun safes, gun security devices, .45 caliber bullets, shell casings, primers, gunpowder, and any devices capable of manufacturing ammunition; pistols and pistol parts including, but not limited to, suppressors, barrels, sides, grips, and any aftermarket parts designed to be used in upgrading, changing, or deviating a firearm from the manufacturer's stock condition.     (C) CLOTHING, to wit: shirts, pants, masks, handkerchiefs, hats, and any other item of clothing that the supsected party might have worn during the commission of the offense.   (D) PERSONAL ITEMS, to wit: condoms, prophylactics, personal lubricant.   (E) WRITINGS, to wit: pictures, photographs, writings, diaries, notes, and any other items produced by the suspected party describing any detail of the investigation. (F) Any and all items belonging to Kristene Chapa or Mollie Olgin.

The affidavit set out sufficient probable cause to seize the computers and electronic media devices at the Strickland home.   The letter sent to Chapa's father was a key piece of evidence in reopening a cold case; the details contained in the letter were not publicly disseminated and most likely, would only be known by involved parties. Therefore, the information contained in the affidavit showed there was "some evidence" that the computer contained evidence of the crime committed.  *See Foreman*, 516

60

S.W.3d at 237. The affidavit within its four corners was sufficient to justify the magistrate's issuance of the search warrant.

### 2. Length of Time

Strickland also alleges that the search warrant affidavit described an event remote in time to the actual search. Although the murder occurred in 2012, the letter that prompted the search of Strickland's home was received in 2014. Portland police drafted the affidavit for the search warrant shortly after the letter was received and their investigation began pointing to Strickland as a suspect.

There must be sufficient facts within the affidavit to support a probable-cause finding that the evidence is still available and in the same location. *Crider v. State*, 352 S.W.3d 704, 707 (Tex. Crim. App. 2011). The "proper method to determine whether the facts supporting a search warrant have become stale is to examine, in light of the type of criminal activity involved, the time elapsing between the occurrence of the events set out in the affidavit and the time the search warrant was issued." *Id.* (quoting *McKissick v. State*, 209 S.W.3d 205, 214 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd)).

Although the main event set out in the affidavit did occur two years prior, a new event had occurred in the "cold case" that the Portland police were investigating, and that event, the receipt of the letter, changed the direction of the case and who the police considered a suspect. Therefore, the length of time between the letter being taken to the police and the search warrant being issued was not so long that the facts supporting the search warrant had become stale. *See id.*

61

### 3. General Warrant

Strickland also claims the warrant's lack of specificity made it into a general warrant and violated his constitutional rights. However, as shown above, the affidavit requested certain types of evidence that the probable cause statement showed to be relevant to the investigation of the murder. The warrant was specific as to what law enforcement intended to investigate in their search. We overrule Strickland's fifteenth, sixteenth, and seventeenth issues.

## VIII. JURY NOTE

By his eighteenth issue, Strickland alleges that the trial court read back testimony that misled the jury about the bullet casings.

### A. Standard of Review and Applicable Law

Article 36.28 provides that, if the jurors disagree as to the testimony of any witness, they may have read to them that part of the witness's testimony that is in dispute. *Thomas v. State*, 505 S.W.3d 916, 923 (Tex. Crim. App. 2016) (referencing TEX. CODE CRIM. PROC. ANN. art. 36.28). The court of criminal appeals has held that the purpose of article 36.28 is "to balance our concern that the trial court not comment on the evidence with the need to provide the jury with the means to resolve any factual disputes it may have." *Id.* (quoting *Howell v. State*, 175 S.W.3d 786, 790 (Tex. Crim. App. 2005)). When the jury asks the trial court to read back certain disputed testimony, the trial court judge must first determine if the jury's inquiry is proper under article 36.28. *Id.* If it is proper, the trial court must then interpret the communication and decide what sections of the testimony will best answer the inquiry. *Id.* The trial court has the discretion to decide

62

"what sections of the testimony will best answer the query, and limit the testimony accordingly." *Id.* However, if a trial court reads too much or too little testimony to the jury, such a response may serve to bolster the State's case unnecessarily. *Id.* An appellate court should not disturb a trial court's decision under article 36.28 unless a clear abuse of discretion and harm are shown. *Id.*

## B. Discussion

Strickland complains about two of the jury notes:

Jury note number two stated

We would like the specifics of what Mr. Hitchcock testified about the casings from the crime scene matching the glock [sic].

Jury note number three stated

There is a dispute as to whether or not Mr. Hitchcock testified that the casings recovered from the scene came from the glock [sic] (st. 26). Specifically, with what certainty did he know the casings could be matched to that firearm? We believe this to have been at the end of his testimony.

Defense counsel objected to answering the jury's question other than stating that "no testimony answers" the question regarding the "level of certainty" Hitchcock testified to having, because he stated he did not testify as to a certainty percentage. The trial court overruled Strickland's objection.

Defense counsel objected further as the discussion between the State, defense, and the trial court continued. Counsel stated that any answer not put into context by the voir dire testimony outside the jury's presence was misleading. The trial court did not allow testimony from the voir dire of Hitchcock to be read back to the jury because the jury never heard the voir dire testimony during questioning. The trial court allowed the

State and Strickland to propose portions of Hitchcock's testimony to be read back to the jury, as well as some of the lead up questions for context.   The following response was sent to the jury:

TESTIMONY READ BACK TO JURY:

BY [THE STATE]:

Q:      State's Exhibit 24, which has two spent casings; Defendant's Exhibit 1, which is one spent casing; and State's 17, which is one spent casing, were fired from the pistol contained in State's Exhibit 26?

A:      Yes, sir.   It is my expert opinion based upon my training and my experience, that these four cartridge cases were fired in this gun.

****

BY [DEFENSE]:

Q:      On December 4, 2014, did you actually receive State's Exhibit 26, this Glock?   Did you do some testing with this, sir?

A:      Yeah.

****

Q:      Okay.   Now, you made some alterations to this Glock, correct?

A:      No, sir.

Q:      You did not?

A:      I installed a part that was submitted.   I did not alter that firearm in any way.

Q:      Okay.   Was there a firing pin already in it?

A:      Yes, sir.

Q:      So you removed the firing pin that is in it?

A:      Yes, sir.

Q:   And you took another firing pin that was provided to you by Portland Police Department?

A:   Yes, sir.

Q:   And you put that firing pin in this Glock, correct?

A:   Yes, sir.

Q:   Okay.   And so, then you fired it in a controlled environment?

A:   Yes, sir, I did.

****

Q:   Did you look at the ballistics?

A:   I compared the bullets to one another and I compared the cartridge cases to one another in my test fires.

****

Q:   And you compared the casings for those and made sure they all matched, correct?

A:   Yes, sir.

Q:   Then you looked at the firing pin impression.   Let's be clear. Portland Police Department submitted three of—how many casings did they submit to you that time?

****

Q:   It looks like all four were submitted.

A:   Yes, sir.

****

Q:   So you took—you fired casings from the controlled environment, and looked at the four that had been brought into you previously, correct?

A:   Yes, sir.

65

\*\*\*\*

Q:  It says you were observing the features and the FPIs.

A:  Firing pin impression.

Q:  That's one of the major things of identification of casings, correct?

A:  Yes, sir.

\*\*\*\*

Q:  And repetitive and consistent patterns of matching features and FPIs sufficient to establish identification were not observed?

A:  That's correct.

Q:  Okay.  So—

A:  With that aftermarket firing pin.

Q:  That was the one you put in there, sir.

A:  That was the one submitted for me to put in there.  That was the purpose of the submission.

Q:  All right.  So would it be fair to say, no ID?

A:  No, sir.

Q:  What would it be fair to say?

A:  It was inconclusive.  Neither identified nor eliminated.  It was in inconclusive result, sir.

Q:  You said, "Repetitive and consistent patterns of matching features and firing pin impression sufficient to establish identification—

A:  —were not observed.

Q:  —were not observed."  So that means you didn't see matching patterns.

A:     Yes, sir.

Q:     All right.   So, can I put no matching patterns?

A:     Yes, sir.

****

A:     That's with the aftermarket firing pin.

Q:     Yes, sir.   I understand.   It is a firing pin you were given by Portland Police Department that you installed in there?

A:     Yes, sir.

Q:     No matching, what is the word, pattern?

A:     No matching pattern.

Q:     In the FPI?

A:     Yes, that's absolutely correct.

Q:     And we use FPI for?

A:     Firing pin impression.

Q:     And you call that inconclusive if the patterns don't match.   That's what you said, right?   It is inconclusive testing?

A:     Yes, it is the same shape—everything in the class characteristics match.   It is the same shape.   But the individual characteristics are not there, therefore, you have an inconclusive.   You can't identify it. You can't eliminate it.   You have inconclusive results.

Q:     That means you can't put it to this gun, right?

A:     No.   You can't put it to that firing pin.

Q:     All right.   So, then—

A:     I identified them to that firearm, based upon the breech face.   Not that firing pin.

67

****

BY [STATE]:

Q:      Your Item 42, which is Defendant's 1; and your Item 72A and 72B, which is State's 24; and your Item 51, which is State's Exhibit 17, were all fired from this Glock pistol with the RLP208 serial number, which is marked State's 26.   Is it not?

A:      It is my expert opinion that those four cartridge cases were fired in that firearm.   The Glock pistol.

END OF READ BACK.

Strickland argues that the trial court abused its discretion by "only reading select parts of a witness's testimony to the jury instead of the complete testimony."   Additionally, Strickland claims that the response the trial court sent to the jury amounted to a comment on the weight of the evidence.

We disagree.   Article 36.28 states that "if the jury disagrees as to the statement of any witness they may . . . have read to them . . . that part of such witness testimony or the particular point in dispute, and no other."   TEX. CODE CRIM. PROC. ANN. art. 36.28. The trial court sent the jury portions of the testimony requested by the State and portions requested by Strickland.   Strickland originally wanted the voir dire testimony to be read back to the jury, where Hitchcock stated that he would not testify to a level of certainty; or in the alternative, a response that stated "Continue your deliberations."   Here, the trial court found the jury question to be proper and accordingly determined testimony from both parties should be included in the response.   *See Thomas*, 505 S.W.3d at 923.   We hold that the trial court did not abuse its discretion or comment on the evidence with the response it sent to the jury, as it incorporated testimony requested from both sides.   *See*

*id.* We overrule Strickland's eighteenth issue.

## IX. COMPLAINANT'S ACTIONS

By his nineteenth issue, Strickland claims that Chapa's actions in front of the jury prejudiced him and were intended to inflame the jury.

## A. Applicable Law and Discussion

Strickland argues that during trial, Chapa feigned the need for assistance from the assistant district attorney, who helped her walk to the witness stand. He also claims that Chapa made comments that she did not want to go by Strickland as she passed the jury. He claims her actions amounted to an outburst by a witness.

The State argues that Strickland did not preserve the complained-of error. *See* TEX. R. APP. P. 33.1. In Texas, the defendant generally need not file a motion for new trial to preserve issues for appeal. *Cooks v. State*, 240 S.W.3d 906, 910 (Tex. Crim. App. 2007). However, sometimes a motion for new trial is a "necessary step to adduce facts not otherwise in the record, in order to be able to present these points of error based on those facts in the appeal." *Id.* (citing TEX. R. APP. P. 21.2). Additionally, while a trial judge may grant a new trial based on issues unpreserved during the trial, those same issues might not be cognizable on appeal without first having been timely raised in a motion for new trial. *Id.* Here, Strickland raised his issue in his motion for new trial. Therefore, the issue was preserved. *See* TEX. R. APP. P. 21.2.

Spectator conduct that impedes normal trial proceedings will not result in reversible error unless the appellant shows a reasonable probability that the conduct interfered with the jury's verdict. *See Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996)

(rev'd on other grounds by *Easley v. State*, 424 S.W.3d 535 (Tex. Crim. App. 2014)); *see also Robinson v. State*, No. AP-76,535, 2013 WL 2424133, *6 (Tex. Crim. App. 2013) (mem. op., not designated for publication). In measuring the potential for injury, we consider whether the person who made the outburst was a witness or bystander. *See, e.g.*, *Stahl v. State*, 749 S.W.2d 826, 829 & n.2 (Tex. Crim. App. 1998). We also consider whether the outburst was verbal or non-verbal. *See Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985); *see also Robinson*, 2013 WL 2424133 at *6. When the outburst was verbal, we have considered whether it contradicted the evidence or an applicable legal defense or affected the credibility of testimony. *See, e.g.*, *Ashley v. State*, 362 S.W.2d 847, 851 (Tex. Crim. App. 1962). We weigh the inflammatory effect of the outburst against the strength of the evidence. *See, e.g.*, *Stahl*, 749 S.W.2d at 832.

Strickland claimed that Chapa's actions during trial were unfairly prejudicial, but he failed to show a reasonable probability that Chapa's actions "interfered with the jury's verdict." *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). Chapa's need of assistance was due to the injuries she endured from being shot in the head. The jury was aware of the underlying offense Strickland was on trial for, and Strickland does not show how her actions contradicted the evidence or affected her credibility. *See. e.g.*, *Ashley*, 362 S.W.3d at 851. Additionally, the comments Chapa supposedly made to the jury were not a part of the reporter's record. The affidavit referred to in Strickland's motion for new trial includes no evidence of what Chapa supposedly said, and no evidence was presented at the motion for new trial hearing regarding the allegation that Chapa made comments to the jury. We overrule Strickland's nineteenth issue.

70

## X. WARRANTLESS SEARCH OF STRICKLAND'S GUN

By his twentieth and twenty-first issues, Strickland argues that the trial court abused its discretion by failing to suppress evidence obtained from the warrantless search of his firearm.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard. *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018). In reviewing the trial court's decision, we do not engage in our own factual review. *State v. Molder*, 337 S.W.3d 403, 405 (Tex. App.—Fort Worth 2011, no pet.). The trial judge is the sole trier of fact and judge of credibility of witnesses and the weight to be given to their testimony. *Lerma*, 543 S.W.3d at 190. When reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *State v. Kelly*, 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818. We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens,* 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State,* 123 S.W.3d 401, 404 (Tex. Crim. App. 2003) ("Our task . . . is to determine whether the trial court could have reasonably denied

71

appellant's motion to suppress given the record evidence and given the applicable federal and state law.").

## B.    Applicable Law and Discussion

Following the suppression hearing, the trial court issued findings of fact and conclusions of law which stated:

FINDINGS OF FACT:

8.    Officer Rangel testified that he was initially investigating a charge of unlawful carrying of a weapon.

. . .

10.    Officer Rangel testified that he disarmed the Defendant and the handgun that the Defendant had about his person was seized as possible evidence for an unauthorized concealed weapon investigation.

. . .

12.    The Defendant was not arrested by the Portland Police Department for any offense on July 19, 2012.

13.    On July 20, 2012 the Defendant went to the Portland Police Station to retrieve his weapon as the Defendant told Portland Police Detective Roland Chavez he was leaving town and wished to take his handgun on his trip.

14.    On July 20, 2012, Detective Chavez requested that the Defendant allow him to fire the weapon and take ballistic evidence as the Defendant was told Detective Chavez was investigating a homicide and assault that had been committed using a .45-caliber pistol.

15.    The Defendant voluntarily signed consent to allow the search of his handgun.

16.    There is no evidence of duress or coercion in securing such consent.

17.    The Defendant's handgun was fired and shell casings were preserved for evidence and analysis.

18.     The Defendant's handgun was released back to him by Detective Chavez on July 20, 2012.

CONCLUSIONS OF LAW:

1.      The seizure of the Glock 30, .45-caliber handgun by Officer Rangel on July 19, 2012 was authorized as it was in plain sight, taken to disarm the Defendant and placed into evidence because the officer was investigating an unauthorized carrying of a weapon.

2.      Said incident later turned into an unlawful carrying of a handgun by a license holder charge against Defendant, Strickland.

3.      The subsequent search of the handgun by Detective Chavez was lawful as the Defendant consented in writing to such search knowingly and voluntarily and the Defendant was not under any duress or coercion to sign and grant said consent.

"The investigation of an offense is not the equivalent of an arrest." *Garcia v. State*, 625 S.W.2d 431, 432 (Tex. App.—Houston [14th Dist.] 1981, pet ref'd). A citizen's complaint may be sufficient in itself to prompt further investigation of an offense. *Joseph v. State*, 3 S.W.3d 627, 634 (Tex. App.—Houston [14th Dist.] 1999, no pet.). Here, Officer Rangel testified that the police had received a call about a man with a gun at a local business. The license plate number given by the caller led them to Strickland's house. When he approached the home, Strickland was not wearing a shirt; however, after he took his dog inside, Strickland returned wearing a shirt and clearly carrying a handgun under his shirt. Officer Rangel stated that police were looking into a possible weapons violation, since Strickland had a concealed carry license, and that was one of the reasons he seized the weapon. *See* TEX. PENAL CODE ANN. § 46.035 (unlawful carrying of a handgun by a license holder).

The State argues that officers could seize Strickland's weapon under the "plain

view" doctrine. Law enforcement officer may seize items in "plain view" if: (1) the initial intrusion was proper, that is, the police have the right to be where they are when the discovery is made, and (2) it is "immediately apparent" to the police that they have evidence before them (i.e., probable cause to associate the property with criminal activity). *Horton v. California*, 496 U.S. 128, 137 (1990); *see also Morales v. State*, No. 13-98-00555-CR, 2000 WL 34251157, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2000, no pet.) (mem. op., not designated for publication). Here, again, Officer Rangel was called out to investigate a possible weapons violation and Strickland emerged from his home carrying the possible firearm they were looking for. Therefore, the seizure of Strickland's firearm was justified.

Officer Chavez testified that when he asked Strickland for his consent to search his handgun, Strickland gave it and signed a consent to search form. A search conducted pursuant to consent is specifically exempted from the general rule that a search is unreasonable when conducted without a warrant or probable cause. *Tucker v. State*, 369 S.W.3d 179, 185 (Tex. Crim. App. 2012). There was no testimony that Strickland's "will was overborne" or "coerced" when Officer Chavez asked for his consent to search. *Id.* The trial court found that he "voluntarily signed consent" and there was "no evidence of duress or coercion." *See Kelly*, 204 S.W.3d at 818–19.

The trial court properly denied Strickland's motion to suppress the seizure and testing of his handgun. We overrule his twentieth and twenty-first issues.

## XI.  CHAIN OF CUSTODY AND DNA TESTING

By his eighth, twenty-second, twenty-third, twenty-fourth, and twenty-fifth issues, Strickland argues that the State failed to disclose all of the chain of custody reports prior to trial, which violated his due process rights, and that the reports revealed the existence of the Caucasian pubic hair found on Chapa.   By issue twenty-six, Strickland argues the trial court abused its discretion by denying his motion for new trial on this basis.   By issue twenty-seven, Strickland states that this Court erred by denying his motion to abate this appeal for consideration of newly discovered evidence and new science.

## A.     Discussion

Strickland's appellate counsel obtained over six hundred pages of chain of custody reports following a public records request.   Strickland alleges that because his trial counsel did not have the complete chain of custody reports, he was unable to tell whether the Caucasian pubic hair found on Chapa was tested for DNA, and he was led to believe that the hair matched Olgin.

However, at the motion for new trial hearing, appellate counsel stated that he could not find the documents relating to the hair sample in the DPS chain of custody documents. Appellate counsel also stated that the Caucasian pubic hair does not microscopically match Olgin, Chapa, or Strickland.   The State and appellate counsel agreed that the type of DNA testing available at the time of trial was unable to extract a sufficient quantity of DNA from the hair, but since trial, a new type of DNA testing was available that could possibly develop a DNA profile from a smaller quantity of a sample.

75

One of Strickland's trial attorneys testified at the motion for new trial hearing. He stated that he was told about the new type of DNA testing by appellate counsel following trial. He recalled that he was given information that the hair evidence was sent to the Federal Bureau of Investigation (FBI) crime lab in Quantico, Virginia, and Strickland was excluded as a contributor. On re-direct, trial counsel stated he believed the hair had had a visual comparison, but was not tested for DNA. He was under the belief that no DNA could be obtained from the pubic hair sample.

In his brief, Strickland now states that he did not learn the DNA was not tested and did not match Olgin until he received the complete chain of custody reports. Strickland did not raise this issue prior to his motion for new trial. Additionally, the State indicated during trial that it "turned the FBI stuff" over to defense counsel, which included the lab reports that identify the isolated pubic hair.

The State had a continuing obligation to turn over the chain of custody reports, but defense counsel was aware of the pubic hair that was isolated. *See Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999). Strickland makes a vague claim that his trial counsel was ineffective because he was missing over six-hundred pages of chain of custody documents. However, the pubic hair at the center of this issue was documented in the FBI crime lab reports that defense counsel did receive. Defense counsel also testified that he knew about the pubic hair and that Strickland was excluded as a contributor.

Therefore, the evidence central to Strickland's claim was disclosed to defense counsel, and his defense counsel testified that he was aware of it. Although the State should have continued to turn over the chain of custody documents, Strickland has not shown how the additional pages of the chain of custody records would establish a "reasonable probability that the outcome of the trial would have been different." *Pena*, 353 S.W.3d at 809. We overrule Strickland's eighth, twenty-second, and twenty-third issues. Additionally, Strickland does not provide any argument in his brief regarding how the trial court abused its discretion in denying his motion for new trial, and we find issue twenty-six to be inadequately briefed. *See* TEX. R. APP. P. 33.1.

Regarding issues twenty-four, twenty-five, and twenty-seven, although also inadequately briefed, we note that the trial court ordered the Caucasian pubic hair to be tested for DNA at the motion for new trial hearing and those results have been received by the parties, rendering those issues moot. *See* TEX. CODE CRIM. PROC. ANN. art. 64.03. However, the DNA evidence results were not presented to the trial court for its review and are not a part of the appellate record for this direct appeal. *See id.* art. 64.04. Accordingly, we may not address those results in this memorandum opinion. *See id.* art. 64.05. Given the appropriate scope of review on appeal, we express no opinion regarding this evidence or its significance in other contexts.

Any additional argument that this Court erred by denying his motion to abate for consideration of newly discovered evidence and new science is also inadequately briefed, and also now moot, based on the results received. *See* TEX. R. APP. P. 33.1, 47.1. We overrule Strickland's twenty-fourth, twenty-fifth, twenty-sixth, and twenty-seventh issues.

## XII. CONCLUSION

We affirm the judgment of the trial court.[14]

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
23rd day of January, 2020.

---

[14] Having found the evidence was sufficient to support the conviction, we deny Strickland's "Motion to Reverse and Render Based Upon Insufficient Evidence and to Vacate the Conviction and Seek Immediate Release" filed with this Court on October 26, 2018.